2023 PA Super 159

| IN THE INTEREST OF: M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 439 EDA 2023 |

Appeal from the Order Entered January 18, 2023,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s): CP-51-DP-0002129-2015.

BEFORE: PANELLA, P.J., KUNSELMAN, J., and KING, J.

OPINION BY KUNSELMAN, J.:                    **FILED AUGUST 30, 2023**

In this matter, we decide whether a juvenile court's dependency adjudication may serve as a basis to amend a non-party's report of child abuse from "indicated" to "founded," pursuant to the Child Protective Services Law (CPSL). **See** 23 Pa.C.S.A. § 6303(a) (definition of "founded report"). Pursuant to the CPSL, certain judicial adjudications – including a dependency adjudication under the Juvenile Act[1] – may serve as the basis for designating a report as "founded," so long as the judge determined there was clear and convincing evidence of child abuse. **See id.** When a report is "founded," the name of the perpetrator is placed on a statewide registry, which in turn triggers a litany of consequences. In this case, the Juvenile Division of the Philadelphia County Court of Common Pleas (the juvenile court) adjudicated dependent M.M., the 12-year-old son of J.D.-S. The dependency proceedings

---

[1] **See** 42 Pa.C.S.A. § 6341.

began after the death of M.M.'s sibling. Allegations of child abuse were made against J.D.-S. (Mother) and E.M. (Appellant), a family friend. In its adjudicatory order, the court found child abuse and determined that the reports of Mother and Appellant should be amended from "indicated" to "founded." Appellant appealed, maintaining that the juvenile court exceeded its authority under the CPSL, because she was not a party to the underlying dependency action. After careful review, we agree, and therefore we vacate that provision of the adjudicatory order pertaining to Appellant.

The record discloses the following factual history. Philadelphia Department of Human Services (DHS) had been intermittently involved with Mother and her Children for over a decade.[2] In December 2021, Appellant moved into Mother's home to help Mother care for the Children. At the time, the Children (son M.M., daughter C.S., and son Ch.S.) were 11, 12, and 13 years old, respectively. On February 19, 2022, C.S. (Decedent) died; she had just turned 13. The circumstances surrounding her death are tragic.

> The [child protective services] report alleged that the [Decedent] was taken to Saint Christopher's Hospital for Children by emergency medical services after she was found nonresponsive that morning. CPR was administered without success, and the [Decedent] was pronounced dead at the hospital. The report alleged that Mother and a family friend, [Appellant], resided in the home with the [Decedent] and the [two other] Children. The CPS report further alleged that Mother and [Appellant] felt the [Decedent's] anorexia

---

[2] W.M. (Father) appeared at the adjudicatory hearing. However, he wished to be excused from the proceedings, and without objection, the juvenile court granted his request. Father was not otherwise involved in this matter.

was [reoccurring] because she had not been eating as much as normal. [Appellant] stated that when she checked on the [Decedent] around 7:00 AM, she was slow to respond, disoriented, and her heartbeat was racing. [Appellant] checked on the [Decedent] two hours later and she was nonresponsive. The report further alleged that the [Decedent] was taken to the hospital wearing an adult diaper. This report was indicated.

That same day, DHS received a supplemental [child protective services] report alleging that once the [Decedent] arrived at the hospital, staff performed CPR for 25 minutes, which proved to be unsuccessful. It was also reported to the Philadelphia Police Department that the [Decedent] had lividity[3] in her right cheek, right earlobe, back, and buttocks, and that her pupils were dialed six inches. The report further alleged that Mother and [Appellant] resided in the home […]. Based on the lividity of the [Decedent's] body, the Philadelphia Police Department [] believed that [Appellant's] account that the [Decedent] was alive at 7:00 AM was incorrect. This raised concerns that there was a delay in medical care that could have contributed to her death.

On February 22, 2022, DHS received [another] supplemental [child protective services] report […]. This report alleged that the [Decedent] slept in the same bed as [Appellant]. The report further alleged that the [Decedent] had been refusing food for days and that she was wearing a diaper because she was too weak to walk to the bathroom. The [] report alleged that at 7:00 AM, the [Decedent] reportedly woke up and [Appellant] noticed that her heart was racing. The report alleged that [Appellant] left the room, went back to sleep, and when she returned two hours later, the [Decedent] was cold to the touch and nonresponsive.

---

[3] "Lividity" refers to "reddish to bluish-purple discoloration of the skin due to the settling and pooling of blood following death." Lividity, Merriam-Webster, https://www.merriam-webster.com/dictionary/lividity.

Trial Court Opinion, 3/8/23 (T.C.O.), at 2-3 (style adjusted) (footnote added) (citations to the record omitted).

In March 2022, DHS obtained an order of protective custody for the Decedent's surviving brothers, M.M. and Ch.S. Two days after the order of protective custody, Ch.S. went "AWOL."[4] Meanwhile, DHS filed a dependency petition against Mother, alleging that M.M. was without proper parental care or control. In April 2022, DHS determined there was substantial evidence of abuse, and thus DHS "indicated" the report of child abuse and named Mother and Appellant as perpetrators for their failure to provide the Decedent with necessary medical care.

The juvenile court conducted dependency proceedings over the course of four dates: May 4, 2022; July 19, 2022; October 20, 2022; and January 18, 2023. Evidently, the proceedings were continued on each on the first three dates, culminating with a substantive adjudicatory hearing on January 18, 2023. Only the transcript for the final January date was made a part of the record. As far as we can discern from record, the appellate briefs and the T.C.O., the following procedural history transpired:

On the first hearing date, May 4, 2022, Appellant appeared before the dependency court in answer to a witness subpoena.[5] At the conclusion of that

_____

[4] DHS had yet to locate Ch.S. as of January 18, 2023, the date of the order from which Appellant appealed.

[5] We note that the only subpoena in the record is for Appellant's presence on January 18, 2023 – the last hearing date.

first date, the dependency court appointed counsel to represent Appellant in an "unassigned role." Also on this date, DHS notified Appellant, pursuant to CPSL, that the report of child abuse against her was deemed "indicated." The court evidently heard testimony from DHS about the death of Decedent, and the Agency's subsequent investigation. *See* DHS's Brief at 3. Later that month, on May 26, 2022, Mother was criminally charged with third-degree murder and endangering the welfare of a child.

The dependency proceedings resumed on July 19, 2022. On this second date, Mother's counsel requested a continuance, which the court granted. Appellant and her lawyer were present for the second day. Appellant's counsel objected to the dependency court's jurisdiction over Appellant, maintaining that Appellant was a non-party and that she had not been served with any sort of petition. Appellant's counsel also informed the court that she could not access the sealed juvenile docket, because Appellant was not a party to the dependency proceedings. DHS countered that it had informed Appellant's counsel, *via* email, of its witness list and exhibits 30 days prior to the hearing. DHS also said that it sent a letter to Appellant informing her that the child abuse report against her was "indicated." The court agreed with DHS, noting that Appellant was aware of the evidence and testimony against her, and, because Appellant's counsel was present, Appellant must have received notice. *Id.* at 5.

The proceedings resumed on October 20, 2022. On this third date, Appellant's counsel renewed her jurisdiction objection and further argued that

while DHS emailed a redacted version of the dependency petition, service was still deficient.  The court determined that if notice had been defective originally, it was cured by Appellant's signature of her subpoena in July and her receipt of the emailed, redacted dependency petition.[6]

The proceedings culminated on the fourth and final date, January 18, 2023, which we understand to be the substantive hearing.  Counsel for Appellant re-raised the jurisdiction and notice objections.  Appellant's counsel reasoned that even if Mother's dependency petition somehow sufficed as notice, notice was still defective because the narrative contained in the petition did not allege any specific abuse or neglect on the part of Appellant – only on the part of Mother.  **See** N.T., 1/18/23, at 9-11.  Appellant maintained that she had never received a formal written petition, summons, or other documentation explaining that DHS sought to establish a "finding" of child abuse against her through this juvenile court hearing. **See id.** at 11.  The court overruled Appellant's objections and proceeded with witness testimony.

The DHS investigative social worker testified about the allegations in the child protective services reports.  In addition to the allegations mentioned above, the social worker testified that Appellant told her of the following: that Appellant moved into the home to help Mother care for the Children; that the Children considered Appellant to be a maternal aunt; that the Decedent was

---

[6] The record contains a copy of the dependency petition, but the copy does not appear to be redacted.  It is unclear what version of the petition Appellant received.

being cyber-bullied prior to her death, which may have contributed to her suspected anorexia; that the Decedent wore adult diapers because she was too weak to walk to the bathroom; and that the Decedent did not receive any medical treatment for these concerns. *See* T.C.O. at 4-5 (citations to the record omitted).

The social worker also testified to the deplorable living conditions: there were animal feces and urine throughout the house; there was a foul odor in each room; there were no sheets on the Children's beds; and the mattresses were stained with urine. Moreover, Children were not up to date on routine medical or dental care. The Children did not have seasonally appropriate clothing; the Children were unkempt; and they were not enrolled in school. *Id.* at 6 (citations to the record omitted). The DHS investigative supervisor also testified to these facts. The supervisor further testified that Appellant told her: the Decedent stopped eating food four months prior to her death and was only drinking water; that the Decedent slept in the same bed as Appellant; and that Appellant gave the Decedent a shower the night before her death. *Id.* at 8-9 (citations to the record omitted).

The juvenile court also heard testimony from Dr. Julia de la Garza-Jordan, an employee of the Philadelphia Medical Examiner's Office, who conducted the Decedent's autopsy:

> Dr. de la Garza-Jordan testified that when the [Decedent's] body arrived at the [Medical Examiner's] Office, it appeared as if it were recently bathed, yet her hair contained copious amounts of lice, which she described as unusual. She also stated that it was striking that the 13-year-old Decedent

- 7 -

was wearing an adult diaper upon arrival. Dr. de la Garza-Jordan testified that the [Decedent] was underweight and had pressure ulcers on her bilateral heels and in the lumbosacral region. The pressure ulcers were significant because it meant that the [Decedent] was in stasis, positioned on her back with her heels on a surface, which caused her blood to stop circulating properly.

Dr. de la Garza-Jordan also testified that there were several inconsistences between the findings she observed from examining the [Decedent's] body and the statements made in the DHS investigator's report. [...].

After conducting the autopsy, Dr. de la Garza-Jordan was able to determine, to a reasonable degree of medical certainty, that the [Decedent's] cause of death was inanition. She defined inanition as starvation to the point of organ failure and death. Dr. de la Garza-Jordan came to this conclusion because the [Decedent] had a low body mass index, had a significant weight loss of over 60 pounds [7], had lice when she arrived at the [Medical Examiner's] Office, and underwent several unsuccessful rounds of CPR at the hospital. She also came [to] this conclusion because the [Decedent] was underweight and wearing an adult diaper, yet received no medical care. Dr. de la Garza-Jordan also determined, to a reasonable degree of medical certainty, that the [Decedent's] manner of death was a homicide.

T.C.O. at 7-8 (citations to the record omitted) (footnote added).

At the close of testimony, the juvenile court entered an order adjudicating M.M. dependent. The court did not rule on the dependency petition regarding the brother, Ch.S., which it left "open," due to DHS's inability to locate him. In its adjudicatory order, the court stated:

---

[7] The court heard testimony that the decedent weighed between 160-180 pounds in October 2021, and 107 pounds at the time of her death in mid-February 2022. *See* T.C.O. at 10 (citations to the record omitted).

> After consideration of the evidence, it is ORDERED that the Child [(M.M.)] is found, by clear and convincing evidence, to be a Dependent Child pursuant to: Child Abuse.
>
> (1) The child is without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.

Adjudicatory Order, 1/18/23, at 2.

However, the juvenile court did not find M.M. was a victim of abuse in the disposition section of the order.

> Victim Of Abuse Determined
>
> The court hereby finds that the Child [(the Decedent)] is a victim of child abuse as defined as 23 Pa.C.S.A. § 6303, in that: [the] report is upgraded from indicated to founded under B.17 and B.19 as to [Mother] and [Appellant].

***Id.*** [8]

We note that the juvenile court did not find "aggravated circumstances" as to M.M.'s dependency.[9]

---

[8] The record does not indicate what "B.17" and "B.19" refer to, although we presume they relate to the court's internal dependency forms.

[9] The Juvenile Act provides:

> If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing […]."

*(Footnote Continued Next Page)*

Appellant timely filed this appeal. She presents the following issues for our review:

1. Did the trial court err and/or abuse its discretion by making a finding of child abuse under the Child Protective Services Law, 23 Pa.C.S. §§ 6303 and upgrading [the child abuse] report from indicated to founded under B.17 and B.19 as to [Appellant], because the court lacked jurisdiction to make such a finding against a non-party to a dependency proceeding: [Appellant] is not a parent, guardian or *in loco parentis* to [the subject child, M.M.] or any of his siblings; [Appellant] was not served with a summons outlining with specificity the cause of action against her; nor was she served with a dependency petition which purported to bring the allegations of child abuse against her to court. Appellant [] was thus denied her federal and state constitutional rights to due process?

2. Did the trial court err and/or abuse its discretion because a dependency proceeding against parents or guardians in the Court of Common Pleas is not a proper forum for finding of child abuse against a non-parent or non-guardian; such a finding is the province of the Bureau of Hearings and Appeals, and the Commonwealth Court?

_____

42 Pa.C.S.A. § 6341(c.1).

Section 6302 defines aggravated circumstances as:

(2) The child **or another child of the parent** has been the victim of physical abuse resulting in serious bodily injury, sexual violence or **aggravated physical neglect** by the parent.

42 Pa.C.S.A. § 6341 (emphasis added).

"Aggravated physical neglect" is further defined as: "Any omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." **Id.**

- 10 -

3. Did the trial court err and/or abuse its discretion by making a finding of child abuse under the Child Protective Services Law, 23 Pa.C.S. §§ 6301-6385 because [DHS] did not present clear and convincing evidence of each of the necessary elements of such a finding.

Appellant's Brief at 6.

These issues concern the complicated interface between the Child Protective Services Law and the Juvenile Act. Questions regarding the application or interpretation of a statute are questions of law, for which our standard of review is *de novo* and our scope of review is plenary. **See E.C.S. v. M.C.S.**, 256 A.3d 449, 454 (Pa. Super. 2021); **see also Interest of D.R.**, 232 A.3d 547, 554-55 (Pa. 2020) (citation omitted).

> A court's role when interpreting a statute is to determine the intent of the General Assembly so as to give it its intended effect. 1 Pa.C.S. § 1921(a). "In discerning that intent, the court first resorts to the language of the statute itself. If the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent to the case at hand and not look beyond the statutory language to ascertain its meaning." **In re L.B.M.**, 161 A.3d 172, 179 (Pa. 2017); **see also** 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

**D.R.**, 232 A.3d at 555.

We begin our discussion with necessary background. The CPSL "was created primarily for reporting suspected child abuse, providing the means for doing so, and establishing the persons responsible for reporting the abuse." **Interest of C.B.**, 264 A.3d 761, 771 (Pa. Super. 2021) (*en banc*) (citation

omitted); **see also** 23 Pa.C.S.A. § 6302(b). Upon receiving a report of alleged child abuse, the Department of Human Services, or its designated county children and youth agency, investigates the veracity of the allegations. Under the CPSL, "[t]he term 'child abuse' shall mean intentionally, knowingly or recklessly doing" any of an express list of ten forms of conduct including, *inter alia*, "[c]ausing bodily injury to a child through any recent act or failure to act[,]" "[c]reating a reasonable likelihood of bodily injury to a child through any recent act or failure to act[,]" and, "[c]ausing serious physical neglect of a child." 23 Pa.C.S.A. § 6303(b.1)(1), (5), (7).[10]

After the agency completes its investigation, it categorizes the investigated report as "indicated," "founded," or "unfounded." **Id.** §

_____

[10] Section 6303 further defines "serious physical neglect" as:

> Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:
>
> > (1) A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.
> >
> > (2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

**Id.** § 6303(a) (definition of "serious physical neglect").

6368(n)(1); *see also J.F. v. Department of Human Services*, 245 A.3d 658, 660 (Pa. 2021).

> A report of suspected child abuse is "unfounded" if the report cannot be either indicated or founded. *Id.* § 6303(a) (definition of "unfounded report"). An "indicated" report is one wherein the determination relies on DHS's or the county agency's own assessment that their investigation revealed "substantial evidence of the alleged abuse by a perpetrator exists based on" available medical records, the child protective services investigation, or an admission of the acts of abuse by the perpetrator. *Id.* (definition of "indicated report"). A report is "founded" as a result of a determination or disposition made by a judicial authority, external to DHS, but in reliance on the same factual circumstances involved in the allegation of child abuse. *Id.* (definition of "founded report").

*J.F. v. Department of Human Services*, 245 A.3d 658, 660-61 (Pa. 2021) (some internal quotations omitted).

When a report of child abuse is substantiated as either "indicated" or "founded," or amended from "indicated" to "founded," the named perpetrator is provided with notice of the status, including the effect of a substantiated report upon future employment opportunities involving children, and the individual's name is added to the statewide child abuse database – *i.e.*, the ChildLine Registry – where it could remain indefinitely. *J.F.*, 245 A.3d at 661 (citing 23 Pa.C.S.A. §§ 6331, 6338(a), 6368(f)). A perpetrator's inclusion on

a statewide database has a "bundle of consequences," thereby implicating an individual's right to due process. *Id.* at 671.[11]

The substantive difference between an "indicated" report and a "founded" report is how the veracity of the allegations is established, and the mechanism by which an individual – once deemed a perpetrator – can contest that designation. An "indicated" report is based on the agency's own assessment. *J.F.*, 245 A.3d at 660. An individual named in an "indicated" report may "request an administrative review by, or appeal and request a hearing before, the [Department of Human Services] secretary." *Id.* at 661 (citing 23 Pa.C.S.A. § 6341(a)(2)). "Unlike an indicated report, which is solely an agency-level adjudication, a founded report additionally reflects a judicial adjudication or disposition made based on the same factual circumstances." *Id.* at 671. The CPSL affords individuals named as perpetrators in "founded" reports of child abuse no rights to administrative or judicial review. However, these individuals are not entirely without recourse, as our Supreme Court explained:

> If [a dependency court] finds the parent to have perpetuated abuse, the relevant [county protective services] agency would file with the Department of Public Welfare a "founded report" as defined by Section 6303(a) of the CPSL, which would trigger inclusion on the statewide ChildLine Registry, which is also governed by the CPSL,

_____

[11] These consequences include: the prohibition of employment, volunteer, foster parent, adoption, and housing opportunities to individuals named as a perpetrator in the statewide database. *See* 23 Pa.C.S.A. §§ 6344, 6344.1, 6344.2.

specifically 23 Pa.C.S. § 6331. The finding of child abuse in a dependency proceeding can be appealed to the Superior Court[…]. An individual can also petition to expunge the founded report from ChildLine through a Department of Public Welfare administrative process that would eventually be subject to appeal in the Commonwealth Court.

Additionally, the inclusion on the ChildLine Registry can be triggered outside of the Juvenile Act's dependency process through the filing by [child protective services] agency or the Department of Public Welfare of an "indicated report" of child abuse when "substantial evidence" exists that an individual perpetrated child abuse as defined in Section 6303(a). 23 Pa.C.S. §§ 6303(a), 6331(3). […] As with a founded report, an individual may petition for the expungement of an indicated report through DPW's administrative process that could eventually be appealed to the Commonwealth Court.

***Interest of L.Z.***, 111 A.3d 1164, 1176-77 (Pa. 2015) (footnotes omitted).

Our Supreme Court further explained: "Because the 'founded' designation is dependent upon a judicial determination, the denial of a hearing on an administrative appeal of a founded report has typically been upheld by the Commonwealth Court where it could constitute an impermissible collateral attack on the judicial action." ***J.F.***, 245 A.3d at 671-72 (citations omitted).[12]

This appeal concerns the precise conditions whereby a judicial adjudication may serve as a basis for designating a report as "founded." The

---

[12] Appellant's appeal to this Court is proper for these reasons. As the High Court explained, the Superior Court traditionally hears appeals regarding child abuse determinations within dependency orders; moreover, if Appellant directly sought an administrative appeal, where she presented these issues, the same might have been construed as a collateral attack on the juvenile court's substantive decision.

CPSL provides an exhaustive list of situations in which judicial determination (or disposition) may serve as a basis for a founded report:

> ***(1) There has been a judicial adjudication based on a finding that a child who is a subject of the report has been abused and the adjudication involves the same factual circumstances involved in the allegation of child abuse.*** The judicial adjudication may include any of the following:
>
> > (i) The entry of a plea of guilty or nolo contendere.
> >
> > (ii) A finding of guilt to a criminal charge.
> >
> > ***(iii) A finding of dependency under 42 Pa.C.S.A. § 6341 (relating to adjudication) if the court has entered a finding that a child who is the subject of the report has been abused.***
> >
> > (iv) A finding of delinquency under 42 Pa.C.S.A. § 6341 if the court has entered a finding that the child who is the subject of the report has been abused by the child who was found to be delinquent.
>
> (2) There has been an acceptance into an accelerated rehabilitative disposition program and the reason for the acceptance involves the same factual circumstances involved in the allegation of child abuse.
>
> (3) There has been a consent decree entered in a juvenile proceeding under 42 Pa.C.S. Ch. 63 (relating to juvenile matters), the decree involves the same factual circumstances involved in the allegation of child abuse and the terms and conditions of the consent decree include an acknowledgment, admission or finding that a child who is the subject of the report has been abused by the child who is alleged to be delinquent.
>
> (4) A final protection from abuse order has been granted under section 6108 (relating to relief), when the child who is a subject of the report is one of the individuals protected under the protection from abuse order and:

(i) only one individual is charged with the abuse in the protection from abuse action;

(ii) only that individual defends against the charge;

(iii) the adjudication involves the same factual circumstances involved in the allegation of child abuse; and

(iv) the protection from abuse adjudication finds that the child abuse occurred.

23 Pa.C.S.A. § 6303(a) (definition of "founded report") (emphasis added).

This matter implicates subsection (1)(iii) of the definition above. Proper application of that subsection might entail the following scenario: A county protective services agency receives a report of a parent's child abuse. Following an investigation, the agency petitions the juvenile court to adjudicate the child dependent under the Juvenile Act – that is to say, the child is without proper parental care. *See* 42 Pa.C.S.A. §§ 6302 (definition of "dependent child"), 6341 (relating to adjudication). Supposing that the juvenile court subsequently finds that the child was, in fact, abused and grants the dependency petition, then the court's adjudication could serve as a basis for designating the parent's child abuse report as "founded." In this hypothetical, the parent was a party to the dependency proceedings, received notice, and was afforded an opportunity to be heard.

Returning to the instant matter, Appellant's first and second appellate issues present an interconnected jurisdictional question. She challenges whether the juvenile court may "upgrade" – *i.e.*, amend – a non-party's report

of abuse from "indicated" to "founded." [13]  In essence, Appellant argues that the juvenile court lacked jurisdiction to make a legal determination of child abuse against her, a non-party, to amend her report from "indicated" to "founded."  Appellant argues further that the adjudication of M.M. cannot serve as a basis for amending her report, because the dependency adjudication implicated Mother, not her.

Aside from the jurisdictional component, Appellant maintains she was not afforded proper notice, and thus she was not afforded a meaningful opportunity to be heard.  She reasons that emailed service of a redacted version of Mother's dependency petition did not amount to proper notice – especially since the dependency petition only focused on Mother's conduct, not the acts or omissions of Appellant.  Lastly, in her third appellate issue, Appellant challenges the substantive finding that she was a perpetrator of child abuse, as defined by the CPSL.

We begin our analysis with Appellant's jurisdictional challenge. Appellant's argument hinges on the fact that she was not a party to the underlying dependency proceeding.  In the context of a dependency

_____

[13] Often, and upon the request from the child protective services agency, a juvenile court's dependency order will include an explicit provision determining the report to be "founded," upon its finding that the child was abused.  Such a provision serves the purpose of removing doubt whether the adjudication was sufficiently based on the report's child abuse allegation.  Still, it is the decision of the **agency** to file the report as "founded" on the ChildLine Registry, upon the agency's conclusion that the court's adjudication met the necessary criteria under the CPSL's definition of "founded reported." **See L.Z.**, 111 A.3d at 1176-77.

proceeding, we have defined a party to include "(1) the parents of the juvenile whose dependency status is at issue; (2) the legal custodian of the juvenile whose dependency status is at issue; (3) the person whose care and control of the juvenile is in question." *In Interest of M.R.F., III*, 182 A.3d 1050, 1055 (Pa. Super. 2018) (citations omitted); *see also* 42 Pa.C.S.A. § 6302 (defining a dependent child as *inter alia* one "without a parent, guardian, or legal custodian" and providing that "[a] determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk."). We explained that "[t]hese categories logically stem from the fact that upon an adjudication of dependency, the court has the authority to remove a child from the custody of his or her parents or legal custodian." *M.R.F.*, 182 A.3d at 1055 (citing *In re J.S.*, 980 A.2d 117, 120 (Pa. Super. 2009)).

Appellant was obviously not a parent. Significantly, she was also not a "caregiver," nor a "custodian," for purposes of the Juvenile Act, which defines those individuals as follows:

> "**Caregiver**." A person with whom the child is placed in an out-of-home placement, including a resource family or an individual designated by a county agency or private agency. The resource family is the caregiver for any child placed with them.
>
> […]
>
> "**Custodian**." A person other than a parent of legal guardian, who stands *in loco parentis* to the child, or a

> person to whom legal custody of the child has been given by order of court.

42 Pa.C.S.A. § 6302.

Appellant meets neither of these definitions. None of Mother's three Children was placed with Appellant. Appellant was not the guardian of any of the three Children, nor had she obtained legal custody through a court order. Nor did Appellant stand *in loco parentis*, a status that would have required Mother to "discharge" her "parental duties," and for Appellant to assume the same. ***See***, ***e.g.***, ***Interest of K.N.L.***, 284 A.3d 121, 145 (Pa. 2022). Although Appellant, by her own admission, moved into the home to help Mother care for the Children, Appellant was ultimately not "a person whose care and control" of the child was in question. For example, a live-in nanny would similarly not qualify, nor would a teacher. Notably, the juvenile court, DHS, and the GAL concede that Appellant was not a party to the dependency proceedings. DHS even relied on this fact to explain to the juvenile court why it did not have to serve Appellant in accordance with the normal juvenile court procedure reserved for parents, guardians, or other custodians.[14] Quite clearly, Appellant was not a party to the dependency proceedings.

_____

[14] DHS maintained that it did not have to serve Appellant with the dependency petition it filed against Mother; moreover, Appellant notes that DHS did not seek the issuance of a summons, either.

The Juvenile Act requires the court to direct the issuance of a summons to "the parents, guardian, or other custodian, guardian *ad litem*, and any other persons as appear to the court to be proper or necessary ***parties*** to the
*(Footnote Continued Next Page)*

Having established that Appellant was not a party to the underlying dependency adjudication, we next address the effect Appellant's non-party status had on the juvenile court's ability to implement the CPSL against her. Notwithstanding Appellant's non-party status, the Appellees maintain the juvenile court had the ability to make a child abuse finding against Appellant, such that the dependency adjudication could ultimately serve as the basis to amend Appellant's "indicated" report to "founded." They reason that while Appellant did not meet the definition of a "party" under the Juvenile Act, she did meet the definition of a "perpetrator," as well as the definition of "person responsible for the welfare of the child" under CPSL Sections 6303 ("Definitions") and 6381(d) ("Prima facie evidence of abuse").[15]   **See**

---

proceeding, requiring them to appear before the court at the time fixed to answer the allegations of the [dependency] petition." 42 Pa.C.S.A. § 6335(a) (emphasis added).  The Rules of Juvenile Court Procedure provide, "[t]he court shall issue a summons compelling all **parties** to appear for the adjudicatory hearing." Pa.R.C.P. 1360(A) (emphasis added).  The summons shall include, inter alia, a copy of the dependency petition. **See** Pa.R.C.P. 1360(C)(5).

DHS did not follow this procedure, because it concluded Appellant was not a party to the dependency proceedings.  Instead, DHS subpoenaed Appellant as a witness, pursuant to 42 Pa.C.S.A. § 6333(a).  When the juvenile court ultimately directed DHS to provide Appellant with some form of notice, it apparent did so under Pa.R.J.C.P. 1361(7) ("The court shall give notice of the adjudicatory hearing to: (7) **any other persons** as directed by the court.") (emphasis added).

[15] Sections 6303 and 6381 of the CPSL set forth, who may be deemed a "perpetrator," and how the evidentiary standard applies when a child is abused
*(Footnote Continued Next Page)*

*generally* T.C.O. at 12-13, 17-19; *see also* DHS's Brief at 17-20; *and see* GAL's Brief at 8-12.

Under these CPSL provisions, the juvenile court opines – and the Appellees argue – that the court had jurisdiction because Appellant was: an adult; who lived with Mother and the Children; for the express purpose of helping Mother care for the Children.  While Appellant might not be a party under the Juvenile Act, they maintain that Appellant fit squarely under the CPSL.  In other words, if Appellant was not a caregiver under the Juvenile Act, she was still a caregiver under the CPSL.  Moreover, to the extent Appellant does not fit neatly within the Juvenile Act, the GAL emphasizes that the definition sections of the Juvenile Act and the CPSL must be read together to resolve complaints of child abuse.  *See* GAL's Brief at 8 (citing *In re J.R.W.*, 631 A.2d 1019, 1022 (Pa. Super. 1992)).  Without citation to authorities, DHS argues: "Pennsylvania law holds that [a] dependency court has jurisdiction over a person who is alleged to have abused a child and the CPSL authorizes

_____

in the care of a person responsible for the child's welfare.  Under the CPSL, "a perpetrator" is an individual who has committed child abuse (as defined by the CPSL) and who is, *inter alia*: "An individual 14 years of age or older who resides in the same home as the child."  23 Pa.C.S.A. § 6303(a) (definition of "perpetrator").  The CPSL further defines "a perpetrator for failing to act" to include: "A person 18 years of age or older who resides in the same home as the child."  *Id.*  Elsewhere in the CPSL, Section 6381(d) creates the rebuttable presumption that, when a child suffers abuse that would not ordinarily occur but for the acts or omissions of a person responsible for the child's care, then that individual is responsible.  *See* 23 Pa.C.S.A. § 6381(d); *see also L.Z.*, 111 A.3d at 1185.

the dependency court to enter an abuse finding in a dependency proceeding." *See* DHS's Brief at 15.

At first glance, the reasoning of the juvenile court and Appellees appears sound. Indeed, we have said that the Juvenile Act and the CPSL must be read together in the resolution of child abuse complaints and "reference must be made to the definition sections of both the [CPSL] and the [Juvenile Act] to determine how that finding of child abuse is interrelated." *C.B.*, 264 A.3d at 770 (citing *J.R.W.*, 631 A.2d at 1022). However, the rationale set forth by the juvenile court and the Appellees ultimately misconstrues the interplay between the CPSL and the Juvenile Act.

The question is not whether a juvenile court, sitting under the Juvenile Act, can make a finding of "child abuse" under the CPSL. That question has long been settled. Of course, the juvenile court has jurisdiction to implement the CPSL; in fact, we said that it would be "totally spurious" to argue otherwise. *J.R.W.*, 631 A.2d at 1023.[16] But the question Appellant asks is whether the juvenile court had authority over her, a non-party, to do the things it would normally be authorized to do to proper parties – namely, make a legal determination of child abuse under the CPSL, which could ultimately serve as the basis for a founded report. The answer to that question is no.

---

[16] "[B]y mandate of the [CPSL], the one and only available resource for custody, change of custody or detention of a child who is suspected of being abused under the [CPSL] is the juvenile court pursuant to the Juvenile Act." *J.R.W.*, 631 A.2d at 1023 (citing 23 Pa.C.S.A. § 6315 ("Taking child into protective custody")).

The CPSL does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse. **C.B.**, 264 A.3d at 770 (citing **J.R.W.**, 631 A.2d at 1022). "The [Juvenile] Act, however, is a procedural act which establishes jurisdiction in the courts to legally intervene and make findings of dependency which [could] also include[] child abuse." **J.R.W.**, 631 A.2d at 1022.

In cases predating the current iteration of the CPSL, we explained:

> Even though the Juvenile Act and the CPSL are complementary in nature, neither of the acts provide for an independent action of "abuse." **In Interest of Justin S.,** [543 A.2d 1192, 1197 (Pa. Super. 1988)]; **In Interest of M.B.**, 514 A.2d 599 (Pa. Super. 1986) *affirmed per curiam*, 538 A.2d 496 (Pa. 1988). "[W]e have held that [the] CPSL does not create or include a separate action for child abuse […]." **In Interest of Justin S.,** 543 A.2d at 1197 (citing **In Interest of R.M.R.** [530 A.2d 1381 (Pa. Super. 1987)]).

**In Interest of R.T.**, 592 A.2d 55, 59 (Pa. Super. 1991).

Under the prior iteration of the CPSL, a founded report may be based on a "judicial adjudication of child abuse." **See R.M.R.**, 530 A.2d at 1384-85; **see also** 11 P.S. § 2203 (repealed). This Court grappled with the ambiguity of what may constitute a "judicial adjudication of child abuse" to answer the larger question of whether the CPSL provided for an independent cause of action. **Id.** Ultimately, we concluded that the CPSL does not provide for an independent action for child abuse, and for the relevant provisions of the CPSL to apply, there must be a previously recognized cause of action. **Id.** at 1385.

Although these cases concerned the prior iteration of the CPSL, the substantive difference between the prior and current iterations only buttresses

Appellant's argument that the juvenile court lacked jurisdiction to find that she committed "child abuse" under the CPSL. The current CPSL now specifies what types of "judicial adjudications" may serve as basis for a founded report. **See** 23 Pa.C.S.A. § 6303(a) (definition of "founded report"). They are: the entry of a guilty plea or *nolo contendere*; a finding of guilt to a criminal charge; acceptance into an accelerated rehabilitative disposition (ARD) program; a final Protection From Abuse (PFA) order; an adjudication of delinquency; a consent decree relating to juvenile delinquency; and finally, an adjudication of dependency. **See id.** Thus, for a report to be founded, the finding of abuse must stem from one of these recognized causes of action. If an alleged perpetrator is not a party to one of these underlying causes of action, then it follows that the court lacks authority under the CPSL to make a finding of child abuse, such that the alleged perpetrator's report could be deemed "founded."

We understand that the juvenile court attempted to afford Appellant notice and an opportunity to be heard. The hearing was continued several times over the course of eight months; Appellant was appointed counsel; and at the hearing, Appellant was given an opportunity to introduce evidence and cross-examine witnesses. The CPSL does not provide for an independent cause of action, and because Appellant was not party to the dependency proceedings, it is not surprising that DHS and the juvenile court were perplexed as to how Appellant should receive notice. DHS had no mechanism to seek a "finding" of abuse against Appellant. In any event, our conclusion regarding the jurisdictional aspect of this case renders moot the rest of

Appellant's procedural due process claim. The juvenile court had no authority under the CPSL to make a legal determination of abuse against Appellant to deem her report "founded" – no matter what process was given, no matter the evidence of her culpability, because Appellant was not a party to this case.[17]

The effect of our decision does not leave local child protective services agencies without recourse to protect children from alleged abusers. Indeed, DHS already determined Appellant was "indicated" for abuse.

In sum, we conclude the juvenile court exceeded its authority, as conferred by 23 Pa.C.S.A. § 6303(a) (definition of "founded report"), to find that Appellant committed child abuse for the purpose of deeming her report "founded." Because we conclude that the juvenile court exceeded its authority under the CPSL, we do not address Appellant's other issues. This Court has no authority to address the propriety of Appellant's "indicated" report; the

_____

[17] In reaching this conclusion, we are cognizant of dependency cases where the juvenile court had made findings of child abuse against stepparents or parents' significant others. *See, e.g., Interest of K.D.*, 2023 WL 3916155 (Pa. Super. June 9, 2023) (non-precedential decision). In some instances, the local child protective services agency categorized their reports as "founded." *See*, *e.g.*, *J.M. v. Department of Public Welfare*, 94 A.3d 1095, 1099 (Pa. Cmwlth. 2014); *see also J.P. v. Department of Human Services*, 150 A.3d 173 (Pa. Cmwlth. 2016). But among this line of cases, we have not discovered one in which the stepparent or significant other challenged the juvenile court's jurisdiction, as Appellant does here. Although we might fairly distinguish this line of cases as involving "guardians," "individuals with *in loco parentis* status," or other individuals whose "care and control" of the child was in question (*i.e.*, proper parties to dependency proceedings), those scenarios are not before us.

proper procedure for challenging that determination is explained above. ***See***

***J.F.***, 245 A.3d at 661.

Order vacated insofar as it pertains to Appellant's report being "founded."


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 8/30/2023*