J-S02033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2231 EDA 2023 |

Appeal from the Order Entered July 26, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000717-2021

BEFORE:   LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                  **FILED MARCH 13, 2024**

Appellant D.B. appeals from the Order of the Court of Common Pleas of Philadelphia County, Juvenile Division, adjudicating his minor stepchildren dependent and finding he was a perpetrator of child abuse pursuant to Section 6303(b.1)(1) of the Child Protective Services Law ("CPSL").[1]  On appeal, D.B. argues that the Philadelphia Department of Human Services ("DHS") did not present clear and convincing evidence that he committed child abuse against his 13-year-old stepdaughter, T.F.  We affirm.

The trial court sets forth the relevant facts and procedural history, as follows:

---

[*] Former Justice specially assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 6301-6387.

S.M.[("Mother")] is the mother of child, T.F., and D.B. was Mother's paramour.[2] T.F. is currently 13 years of age. T.F. resided in the family home with [Mother] and D.B., and her younger sister. [DHS] became involved with the family in May of 2021 when it received allegations of domestic violence between D.B. and [Mother] as well as allegations concerning excessive and problematic alcohol consumption by [Mother]. On July 13, 2021, DHS received a Child Protective Services ("CPS") report alleging that T.F. had been sexually abused by D.B. and had been physically abused by [Mother]. This report was indicated. (N.T. June 29, 2023, Pages 8 to 11).

Zoharmella Savoy is employed by DHS and assigned to the MDT Unit.[3] Her duties include investigating reports of child abuse. She testified that she visited the family home shortly after receiving the CPS report that initiated the child abuse investigation. She arrived at the residence and knocked on the door which was answered by [Mother]. D.B. was also present on the first floor and was dressed in his underwear [(later described as boxer shorts. D.B. put on pants before Investigator Savoy entered the home)]. T.F. and her sister were upstairs. After [D.B.] got dressed, Ms. Savoy provided D.B. verbal and written notification of the report and a review of his rights. D.B. responded by telling Ms. Savoy that he was already "cleared of

---

[2] The record contains numerous references to D.B. as T.F.'s stepfather. Notably DHS Investigator Zoharmella Savoy testified that the initial CPS report filed in this matter referred to D.B. as Mother's paramour, but she corrected the record to indicate that "[i]t was learned later that he was the stepfather [at the times in question]." N.T., 6/29/23, at 11. *See also* N.T. at 106. CUA-9 Case Manager Nasir Ismail testified that he assumed a female voice he heard in the background during a phone conversation with D.B. belonged to Mother, "because at the time they allegedly were married." For his own part, D.B. identified himself to the trial court as "Stepfather" at the outset of the dependency hearing, *See* N.T., 6/29/23, at 11. Both Mother's counsel and DHS counsel also referred to D.B. as "Stepfather." *See* N.T., 7/7/23, at 5-6, 30. Finally, we note that counsel for D.B. in his related appeal refers to D.B. as the children's "Guardian."

[3] Investigator Savoy explained that the MDT unit handles ongoing cases that have had valid reports of fatalities, near fatalities, and sex abuse in the past. The case is "either open with the CUA or just has—had some recent activity." N.T., 6/29/23, at 6-7.

that." It later became clear to Ms. Savoy that D.B. was speaking about prior allegations of sexual abuse that occurred in Delaware County and for which he was not prosecuted.[] During this discussion, D.B. and [Mother] brought out a binder containing documents related to a prior CPS report alleging sexual abuse by D.B. D.B. repeatedly told Ms. Savoy that he was never charged. [N.T. at 25].

Ms. Savoy also provided [Mother] verbal and written notifications as well as a review of her rights. [Mother] told her that she did not believe the allegations against D.B. were true. [N.T. at 52-53]. She admitted that she subjected T.F. to physical discipline and that the discipline consisted of striking her with an open and closed hand. She denied harming or abusing the children. N.T. 6/29/23, at 19-24.

D.B. told Ms. Savoy that Mother hits the children, especially T.F., and that he sometimes gets in the middle of it. He mentioned that Mother struck T.F. in the nose and that her nose was bloodied on one occasion. He also stated that when Mother drinks she becomes violent and strikes him as well. N.T. at 26, 27.

Ms. Savoy spoke with T.F. at the residence and during a walk around the neighborhood. She testified that they walked around the block because she wanted T.F. to feel safe while talking to her. Prior to speaking with Ms. Savoy, T.F. stated, "If I talk to you, you can't leave me here because that's what happened before. I said something and I was stuck here." Ms. Savoy testified that T.F. implied that her home situation worsened the last time she spoke out. N.T. at 28.

T.F. told Ms. Savoy about physical abuse inflicted upon her by Mother but did not initially disclose the sexual abuse by D.B. However, T.F. did state that the physical abuse caused by Mother is often spurred by Mother accusing T.F. of having sexual contact with D.B. She told Ms. Savoy that Mother often accuses her of "doing something" with D.B. and sometimes sniffs her vaginal area to assess whether she has been sexual with D.B. N.T. at 42.

Ms. Savoy decided to acquire an Order of Protective Custody ("OPC") for T.F. and her sister based upon the allegations of physical and sexual abuse as well as the fear expressed by T.F. during their conversation. N.T. at 28-31. T.F. stressed to Ms. Savoy that she never allows her younger sister to be alone with

D.B. and that if T.F. is relocated out of the home that under no circumstances can her sister be left there without her. N.T. at 45, 46.

Later on, during July of 2021, it was brought to Ms. Savoy's attention that T.F. wished to speak to her again. T.F. informed Ms. Savoy that she was "ready to talk" and wanted to tell Ms. Savoy everything about the situation concerning Mother and D.B.

T.F. detailed several months of sexual abuse by D.B. the abuse included being shown pornography, being subjected to oral and digital penetration and giving and receiving oral sex. She told Ms. Savoy that she never liked any of the sexual acts and that the abuse was progressing. She stated that at first D.B. placed her hand on his genital area and told her how to touch him and what to do. She described being told to perform oral sex on him and his digitally penetrating her. T.F. told Ms. Savoy that she was scared she was going to be raped. T.F. also spoke of being physically assaulted by Mother on almost a daily basis and described a recent assault during which she thought her nose might have been broken. She also described Mother as drinking alcohol every day. This claim was corroborated by D.B. N.T. at 58-61.

Mr. Ismail testified that he is a social worker who was assigned this case. He testified that there were two telephone calls made to his agency's hotline regarding this case on October 15, 2021 and October 18, 2021. A person who identified himself as Latia Badu claimed that he had gone through his daughter's cell phone and saw months of texts between T.F. and his daughter. The caller stated that he saw a text sent by his daughter to T.F. and that the text read, "if you lie on your family, you can live with us." In the second telephone call to the hotline, the caller stated, "I'm from Africa" and that T.F. "called [his] daughter and is making up lies." Both calls to the hotline originated from the telephone number that the agency had on file for D.B. N.T. at 130, 131. This led Mr. Ismail and this court to conclude that D.B. telephoned his agency, claimed to be someone else, and alleged that T.F.'s allegations were fabricated to convince the agency that he did nothing wrong. [N.T. at 137-140]

Mother testified that she used corporal punishment while raising her children. She denied causing them injuries that required medical attention. She claimed that she did not know D.B. was

- 4 -

sexually assaulting T.F. and stated that she had no reason to suspect that he was a sexual abuser. She also told the court that she placed herself in alcohol treatment but attempted to minimize her drinking by saying that her alcohol use was an accusation that was not proven and that her daughters' claims about her problematic alcohol use were lies. N.T. at 152-164.

T.F. testified about the nature and extent of the physical and sexual abuse she suffered. She stated that she was sexually abused by D.B. on multiple occasions and described that abuse as including his touching her vagina after removing her pants. She described touching her vagina, mouth, and buttocks with his penis. She told the court that D.B. placed his penis inside her mouth and up against, but not inside, her vagina and buttocks. She described being forced to do these things by D.B. and noted that the nature of the force was sometimes his words and other times by physically pulling her toward him. N.T., 2/16/23, 9-18.

She testified that she did not believe that Mother was aware of this but also testified that Mother referred to D.B. as a pedophile. T.F. also testified that Mother beat her multiple times. She stated that Mother frequently beat her with her hands and hit her in the face, head, and stomach. She described an instance where she was beaten and she fell to the ground and Mother stood over top of her and choked her by squeezing her neck with her hands. She also mentioned that her mother smelled her vaginal area to check whether D.B. had done anything sexual to her. N.T. at 44-61.

Trial Court Opinion, 9/15/23, at 2-6.

D.B. filed a timely appeal and through newly appointed counsel filed his Brief of Appellant. In his brief, D.B. presents the following question for this Court's consideration:

Did the trial court err in concluding that the Appellant committed child abuse under 23 Pa.C.S. § 6303(b.1)(1), (b.1)(4), and (b.1)(6)?

Brief of Appellant, at 4.

- 5 -

Before we may address D.B.'s appeal on its merits, we must review whether we have jurisdiction over this matter. In an August 30, 2023, published decision, this Court found that a dependency court lacks the authority to make a finding of child abuse against a non-party under the CPSL in a dependency matter, despite culpability. **See Interest of M.M.**, 302 A.3d 189 (Pa. Super. 2023). In the case *sub judice*, it is not disputed that Appellant D.B. neither possessed nor sought recognized party standing in the underlying dependency matter. Given the decision in **Interest of M.M.**, the Child Advocate acting on behalf of T.F. and the Department of Human Services each has notified this Court that it shall not submit briefs defending the trial court's July 7, 2023, finding of child abuse against D.B.

In **Interest of M.M.**, this Court concluded that a juvenile court may not upgrade a DHS-created "indicated report" of an individual's act of abuse to a judicially decided "founded report" of abuse if the individual was not a party to the dependency action. The case arose from a dependency action filed against the mother of three children: 11-year-old son, M.M., 13-year-old daughter C.S., who had died recently from complications related to chronic neglect and advanced anorexia,[4] and 13-year-old son Ch.S. who consequently fled the household and remained "AWOL."

A post-mortem investigation into the death of C.S. generated a CPS report that an adult family friend, E.M., lived in Mother's household, claimed

---

[4] An autopsy report concluded that C.S. died from inanition, which was defined as starvation to the point of organ failure and death. **Id**. at 194.

to have a "maternal aunt"-like relationship with the children, and routinely slept in the same bed as C.S. On the day C.S. died, E.M. told investigators that C.S. had been slow to respond to her prodding at 7 a.m., seemed disoriented, and had a racing heartbeat. E.M. said she returned two hours later to check on C.S., and C.S. was nonresponsive. EMTs were summoned and found C.S. unconscious and wearing an adult diaper. They transported C.S. to a local hospital where she was pronounced dead after failed efforts to revive her.

DHS concluded its investigation by filing an "indicated" report finding child abuse in Mother's household and naming both Mother and E.M. as perpetrators for their failure to provide C.S. with necessary medical care. The circumstances surrounding the death of C.S. prompted DHS to file a dependency action against Mother, alleging that her 11-year-old son, M.M., was without proper parental care or control.[5]

E.M. appeared at the dependency action not as a named party but only in answer to a witness subpoena. After the first day, the court appointed counsel for E.M. in an "unassigned role."

The four-day dependency proceedings against Mother culminated with a substantive adjudicatory hearing held on the final day, at which Appellant E.M., through counsel, continued to raise objections that the juvenile court lacked authority under the CPSL to amend E.M.'s report of child abuse from

_____

[5] In March 2022, Ch.S. went "AWOL" two days after DHS obtained an order of protective custody for the Decedent's surviving brothers.

an agency "indicated" report to a judicially-"founded" report where only the mother was named a party to the dependency action. Specifically, E.M. argued that because she neither was named a party to the underlying dependency action nor received a formal petition or other documentation notifying her that DHS sought to establish a judicial "finding" of child abuse against her through the juvenile court hearing, the court had no jurisdiction over her. The juvenile court overruled E.M.'s objections, found she had committed child abuse for the purpose of deeming her report "founded", and entered its adjudicatory order to that effect *Id.* at 203. E.M. appealed.

On appeal, we vacated the adjudicatory order "insofar as it pertains to Appellant's [(E.M.'s)] report being 'founded'" because E.M. was not a "party" to the dependency hearing, and a juvenile court has no authority over a non-party to do those things it normally may do to parties, such as make a legal determination of child abuse under the CPSL that serves as a predicate to upgrading a child abuse report to judicially "founded." *Id.* at 201-202.[6] We explained that a "party" under governing authority may include only a parent of the juvenile whose dependency status is at issue, the legal custodian of the juvenile, and the person whose care and control of the juvenile is in question. *Id*.

_____

[6] *Interest of M.M.* identifies what types of "judicial adjudications" may serve as a basis for a founded report under the CPSL and observes, "If an alleged perpetrator is not a party to one of these underlying causes of action, then it follows that the court lacks authority under the CPSL to make a finding of child abuse, such that the alleged perpetrator's report could be deemed "founded." *Id.* at 202.

Under the facts, we determined that E.M. obviously was not the parent, nor was she a custodian or a caregiver for purposes of the Juvenile Act. *Id.* at 200 (setting forth definitions under 42 Pa.C.S.A. § 6302).[7] Although E.M. admitted she moved in to help Mother care for the children, she "was ultimately not 'a person whose care and control' of the child was in question." *Id*. As we observed,

> "None of Mother's three Children was placed with Appellant [(E.M.)]. Appellant was not the guardian of any of the three Children, nor had she obtained legal custody through a court order. Nor did Appellant stand in *loco parentis*, a status that would have required Mother to "discharge" her "parental duties," and for Appellant to assume the same.
>
> . . .
>
> For example, a live-in nanny would similarly not qualify, nor would a teacher. Notably, the juvenile court, DHS, and the GAL concede that [E.M.] was not a party to the dependency proceedings. DHS even relied on this fact to explain to the juvenile court why it did not have to serve Appellant in accordance with the normal juvenile

---

[7] Section 6302 of the Juvenile Act sets forth the following definitions:

**"Caregiver."** A person with whom the child is placed in an out-of-home placement, including a resource family or an individual designated by a county agency or private agency. The resource family is the caregiver for any child placed with them.

. . .

**"Custodian."** A person other than a parent or legal guardian, who stands in *loco parentis* to the child, or a person to whom legal custody of the child has been given by order of a court.

42 Pa.C.S.A. § 6302.

court procedure reserved for parents, guardians, or other custodians.

*Id.* at 201.

Therefore, acknowledging that E.M. was not a party to the dependency proceedings and that the CPSL does not provide for an independent cause of action, we held, "The juvenile court had no authority under the CPSL to make a legal determination of abuse against Appellant [E.M.] to deem her report "founded" – no matter what process was given, no matter the evidence of her culpability, because Appellant [E.M.] was not a party to this case."

However, footnote 17 in *Interest of M.M.* acknowledged a possible exception to its holding:

> "[i]n reaching this conclusion, we are cognizant of dependency cases where the juvenile court had made findings of child abuse against stepparents or parents' significant others. . . .  But among this line of cases, we have not discovered one in which the stepparent or significant other challenged the juvenile court's jurisdiction, as Appellant does here.  Although we might fairly distinguish this line of cases as involving 'guardians,' 'individuals with *in loco parentis* status,' or other individuals whose 'care and control' of the child was in question (*i.e.*, proper parties to dependency proceedings), those scenarios are not before us."

*Id.* at 203 n.17 (citations omitted).

In the case *sub judice*, Appellant was recognized by the trial court, Mother, participating agencies, and all counsel as T.F.'s stepfather.  As such, D.B.'s care and control of the child as co-head of T.F.'s household was a central issue at the dependency hearing, although the trial court did not name him a party as such.  Nevertheless, D.B's status as a stepfather residing in the household, which, he maintains in his appellate brief, confers upon him the

status of a "guardian",[8] qualifies him as a "proper party to the dependency proceeding" under to the rationale of **Interest of M.M**.

Again, **Interest of M.M.** defined a party in a dependency hearing to include "(1) the parents of the juvenile whose dependency status is at issue; (2) the legal custodian of the juvenile whose dependency status is at issue; **(3) the person whose care and control of the juvenile is in question.**" **Id.** at 199 (emphasis added). E.M., the appellant in that case, challenged the court's jurisdiction over her when she was neither a named party nor a "party" under any other definition accepted by pertinent authority. Indeed, the dependency adjudication implicated only the mother, not E.M. **Id**.

In contrast, as an undisputed stepfather of T.F. during both the time of T.F.'s abuse and the dependency hearing in question, D.B.'s status in the household and relation to T.F. placed him within those "categories", identified in **Interest of M.M.**, "[that] logically stem from the fact that upon an adjudication of dependency, the court has the authority to remove a child from the custody of his or her parents or legal custodian[,]" leaving the child "without a parent, guardian, or legal custodian." **Id**. The lack of proper care or control may be based on evidence of conduct by the parent, guardian, or custodian that places child at risk. **Id.** at 200.

Therefore, we distinguish D.B.'s status from that of E.M. in **Interest of M.M.**, as he was a person whose care and control of the juvenile T.F. qualified

---

[8] We need not address the question of whether D.B. has accurately defined himself as a guardian.

him as a party over whom the trial court had jurisdiction. Accordingly, we proceed to address his issue on appeal.

The Pennsylvania Supreme Court has set forth our standard of review for dependency cases as follows:

> The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. We review for abuse of discretion[.]

*In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (quotation marks and quotation omitted).

Where, as in the case *sub judice*, the trial court deems parents to be perpetrators of child abuse under the CPSL, we note that "[although] dependency proceedings are governed by the Juvenile Act[9]...the CPSL controls determinations regarding findings of child abuse, which the [trial] courts must find by clear and convincing evidence."[10] *In the Interest of L.V.*, 209 A.3d 399, 417 (Pa. Super. 2019) (citations and footnotes omitted) (footnote added). "[T]he [Juvenile] Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and]

---

[9] Pennsylvania Juvenile Act ("Juvenile Act"), 42 Pa.C.S.A. §§ 6301-6375.

[10] "Clear and convincing evidence" is defined as evidence that is "so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In the Interest of C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quotation marks and quotation omitted).

reference must be made to the definition sections of both the [Juvenile Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated." ***In the Interest of J.R.W.***, 631 A.2d 1019, 1023 (Pa. Super. 1993).

As part of [a] dependency adjudication, a court may find a parent...to be the perpetrator of child abuse[ ] as defined by the...CPSL." ***In the Interest of S.L.***, 202 A.3d 723, 728 (Pa. Super. 2019) (quotation marks and quotations omitted). Under the CPSL, "child abuse" is defined as "intentionally, knowingly, or recklessly doing" one of many acts, including causing bodily injury[11] to a child through any recent act or failure to act. ***See*** 23 Pa.C.S.A. § 6303(b.1) (defining "child abuse").[12]

---

[11] The CPSL defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(b.1) (defining "bodily injury").

[12] The CPSL directs to 18 Pa.C.S. § 302(b) to define "intentionally", "knowingly", and "recklessly."

> (1) A person acts intentionally with respect to a material element of an offense when:
>> (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
>> (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

> (2) A person acts knowingly with respect to a material element of an offense when:

>> (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

*(Footnote Continued Next Page)*

Nevertheless, we have observed that Section 6381(d) provides for an "attenuated" standard of evidence in making a legal determination as to the abuser in child abuse cases when the serious injury suffered would not ordinarily occur except by acts or omissions of the parent or other person responsible for the child's welfare. Specifically, in *Interest of C.B.*, 264 A.3d 761, 773 (Pa. Super. 2021) (*en banc*) this Court held that a trial court's culpability determination as to whether the child abuse was intentional, knowing, or reckless is "superfluous":

> Under Section 6381 of the CPSL, a petitioning party is not required to establish that the parent or caregiver perpetrated the abuse "intentionally, knowingly, or recklessly." Rather, in Section 6381 cases, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible," permitting petitioners to "prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action [or inaction] of the parents or responsible person and the implausible statements of the parents and responsible persons."

*Id.* (quotation and citations omitted). *See* 23 Pa.C.S.A. § 6381(d).

---

> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.
>
> (3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b).

We observed, further, how in ***Interest of J.R.W.*** this Court recognized:

> **This lessened standard of establishing abuse by the caretakers [under Section 6381(d)], coupled with the clear and convincing evidence necessary to find dependency, has been imposed by the Legislature as the standard which the [trial court] must apply in deciding abuse cases**. *Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case. There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse. **The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required**. We find no defect in this reasoning. Such a standard provides maximum protection for the child victim or other children in the community who might be subject to similar abuse if the alleged abuser was not identified and permitted free access to the victim or other vulnerable children. It is not equivalent to a finding of guilt in a criminal proceeding which could result in deprivation of freedom. Thus[,] the [L]egislature has balanced the needs of society and children for protection against the abuser's possible patterned behavior and his/her right to freedom unless found guilty beyond a reasonable doubt.

***Interest of J.R.W.***, 631 A.2d at 1024.

***Interest of C.B.***, 264 A.3d at 771-72 (emphasis in original).

Under Section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

[d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by...[DHS]...and the rebuttal of the parent or responsible person.

***Interest of C.B.***, 264 A.3d at 772 (quoting ***In re L.Z.***, 111 A.3d at 1185) (acknowledging, further, that a parent does not actually have to be physically present with the child at the time of the abuse for the presumption to apply to that parent). ***Id.*** at 1185-86.

The totality of D.B.'s argument on appeal states that because the history of the DHS investigation shows that T.F. initially denied in her interview that she was sexually abused by Appellant, and Investigator Savoy testified that T.F. presented as truthful during this interview, the trial court erred in deeming credible T.F.'s second interview in which she said she was now ready to reveal that D.B. had sexually abused her. To this end, Appellant contends baldly that DHS influenced this testimony.

With this argument, Appellant asks this Court to do what it cannot do, which is to upset the evidence-based credibility determinations of the trial court. Our standard and scope of review in dependency cases is well-settled:

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's

- 16 -

responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*Interest of K.M.*, 305 A.3d 116, 121 (Pa. Super. 2023).

The evolution of T.F.'s willingness to accuse D.B. of sexual assault was addressed first by Investigator Savoy, who indicated that T.F. was afraid to talk about D.B. that day "but was adamant that she never left her younger sister alone with D.B." N.T., 6/29/23, at 46. The second conversation between Ms. Savoy and T.F. occurred sometime in late July of 2021, within the first couple week of T.F.'s placement. Instantly, T.F. said she was ready to talk, that there was more that she wanted to say. N.T. at 57-58. From there, she detailed several months of sexual abuse, from being shown pornography, which, T.F. explained, began when D.B. told her that he wanted to show her about boys. According to Savoy, T.F. described the videos in detail and said the same was done to her. N.T. at 59. To Savoy, T.F.'s switch from an initial denial of sexual abuse to her accusation simply reflected that T.F. Was not willing to talk about the sexual abuse yet. That is why she said at the second meeting, "Now I'm ready to talk." N.T. at 70.

The trial court considered this testimony and found,

T.F.'s statements made to the DHS investigator, CUA, and during her testimony were credible. Despite her failure to initially disclose the sexual abuse inflicted upon her by D.B., T.F. was consistent and unwavering in the allegations she made against him. She was also consistent in credibly describing the physical abuse she suffered at the hands of [Mother].

- 17 -

Trial Court Opinion, at 8.

Applying our standard of review, we find no abuse of discretion in the trial court's assessment that T.F.'s accusation against D.B. provided clear and convincing evidence of his child abuse. Accordingly, D.B.'s claim fails.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/13/2024