J-A30010-17

2018 PA Super 76

| IN THE INTEREST OF: M.R.F., III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: K.L.C. AND J.M.C. | : | |
| | : | |
| Appellants | : | |
| | : | |
| | : | No. 904 WDA 2017 |

Appeal from the Order May 26, 2017
In the Court of Common Pleas of Lawrence County Civil Division at No(s):
No. 33 of 2014

BEFORE:   BOWES, J., STABILE, J., and FORD ELLIOTT, P.J.E.

OPINION BY BOWES, J.:                                     FILED MARCH 28, 2018

Foster parents, K.L.C. and J.M.C. (collectively Appellants), appeal the juvenile court order denying their motion to intervene in the ongoing dependency proceedings involving now four-year-old M.R.F., III ("M.R.F.").[1] We affirm.

The juvenile court succinctly summarized the underlying facts and procedural history as follows:

––––––––––––––––––––––––––––––––

[1] Appellants also filed a complaint for custody against the birth mother and Lawrence County Children and Youth Services ("LCCYS") at civil action 10488 of 2017. Considering the fact that LCCYS has maintained sole legal and physical custody of M.R.F. since he was adjudicated dependent, and that Appellants serve as foster parents at the agency's pleasure and oversight, it is unclear how they have standing to pursue custody under 23 Pa.C.S. § 5324. See In re J.S., 980 A.2d 117, 122 n.3 (Pa.Super. 2009) ("Foster Parents did not stand in loco parentis because their status as foster parents was subordinate to CYF, who maintained legal custody and was primarily responsible for the child's care and custody."). Nevertheless, since there are no issues relating to physical or legal custody in this appeal, we do not address that litigation herein.

> M.R.F. . . . came into the legal and physical custody of Lawrence County Children and Youth Services ("LCCYS") following a domestic violence incident involving his biological parents[, T.S. ("Mother") and M.F., Jr. ("Father")]. Charges were filed against both the Mother and Father as a result of the incident and both were briefly jailed. A dependency action was filed because both parents were in jail and unavailable to care for the child. Mother was released within days and all charges against her were dismissed. M.R.F. . . . was adjudicated dependent with a permanency goal of reunification. LCCYS placed M.R.F. . . . with [Appellants] in a foster home setting [during May 2014,] when he was approximately three (3) months old and [he] has remained in that foster placement since that time. On or around February 3, 2016, LCCYS filed a Motion for Goal Change and a Petition for Involuntary Termination of Parental Rights of [Mother] and [Father]. Subsequent to the filing of the Petition for Involuntary Termination by LCCYS, the Father executed a Consent to Adoption on March 9, 2016 and by Order of Court dated May 13, 2016 his Consent was confirmed and his parental rights were terminated. The Petition for Involuntary Termination of Parental Rights of the Mother was denied by Order of . . . Court dated July 6, 2016. The Motion for Goal Change was also denied, and the permanency goal for M.R.F. . . . has never been changed from reunification with Mother[.]

Trial Court Order and Opinion, 5/25/17, 1-2.

Essentially, the juvenile court found that Mother made substantial compliance with the permanency plan insofar as she attended visitations with M.R.F. regularly and progressed through the allotted reunification services. In addition, the court determined that Mother made significant progress toward alleviating the circumstances which necessitated M.R.F.'s original placement. Specifically, Mother cooperated with criminal authorities, terminated her involvement with Father, and demonstrated her dedication to M.R.F. by maintaining a stable living environment.

On May 2, 2017, the juvenile court confirmed that reunification with Mother was the appropriate permanency goal. Adoption remained the concurrent goal. In an effort to facilitate M.R.F.'s reunification with Mother, the juvenile court awarded Mother one overnight visitation and one four-hour community visit with her son per week. LCCYS retained legal and physical custody of the child, and the juvenile court concluded that his current placement in foster care was appropriate. The agency did not appeal the orphans' court's order denying the petition to terminate Mother's parental rights or the juvenile court's ensuing permanency order that extended the scope of Mother's visitations with her son.

On June 6, 2017, Appellants countered the juvenile court's permanency review order by filing the motion to intervene that is the genesis of the instant appeal. In pertinent part, Appellants asserted that LCCYS deemed them to be a preadoptive placement resource and, during April 2016, the Statewide Adoption and Permanency Network ("SWAN") approved them as adoptive parents. The petition continued that the designation of prospective adoptive parents made them indispensable parties in the dependency proceedings and satisfied the requirements of standing under the Juvenile Act. Appellants requested standing to intervene in the dependency proceedings, including notice of hearings, copies of orders and reports, and the ability to formally express their opinions and preferences concerning how to best achieve M.R.F.'s safety, permanency and

wellbeing. Most importantly, notwithstanding the orphans' court's refusal to terminate Mother's parental rights and the juvenile court's subsequent affirmation of reunification as the permanency goal, Appellants entreated the trial court to proceed with their adoption of M.R.F.

The juvenile court held an evidentiary hearing on May 23, 2017. Appellants testified in support of their petition and presented the testimony of Kayla Gould, the LCCYS caseworker assigned to the family since 2016. Significantly, Ms. Gould testified that the agency considered Appellants to be a preadoptive placement resource and confirmed that they completed SWAN training in anticipation of adoption following the termination of Mother's parental rights. N.T., 5/23/17, at 42-43. On May 25, 2017, the juvenile court entered a memorandum order and opinion that denied Appellants' petition to intervene and explained the basis for its decision. This timely appeal followed.

Appellants assert four issues for our review:

A. Whether the [t]rial [c]ourt erred and abused its discretion by concluding [Appellants'] status as foster parents has never changed and that [Appellants] failed to present evidence which supported their claim that they are pre-adoptive/prospective adoptive[2] parents of the above-named minor child.

_____

2 Appellants, Mother, and the juvenile court employ the terms "preadoptive parent" and "prospective adoptive parent" interchangeably. Neither the Juvenile Act nor the Adoption Act defines either expression, and no precedential authority has distinguished the phrases. Thus, for the purposes of this appeal, the two references describe the identical situation where a would-be parent has a legitimate, genuine, and reasonable expectation of
(Footnote Continued Next Page)

B.      Whether the [t]rial [c]ourt erred and abused its discretion by failing to permit the introduction of testimony necessary for the [c]ourt to give full and adequate consideration to the best interests, health and safety of the child, which is the focus of every case involving the care of children.

C.      Whether the [t]rial [c]ourt erred and abused its discretion by failing to permit the introduction of testimony necessary for the [c]ourt to give full and adequate consideration of the substantial, direct and immediate nature of [Appellants'] interest in the above-named child and dependency matter.

D.      Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law by concluding that [Appellants] do not fit within any classes of individuals who have standing to intervene in the dependency action and are not entitled to intervene in the above-captioned dependency matter pursuant to Pa.R.J.C.P. 1133.

Appellants' brief at 3-4.[3]   While Appellants frame four issues, the argument section of their brief combines Issue A, B, and C for discussion.   For ease of disposition, we separately address the two arguments concerning the juvenile court's decision to exclude certain evidence, Issues B and C, from the remaining arguments regarding standing.

The juvenile court order denying Appellants' motion to intervene raises a question of law that we review de novo.   In re J.S., 980 A.2d 117, 120

(Footnote Continued) ———————————

adoption, even though the authority to finalize the adoption is contingent upon the child care agency's ultimate approval.  See In re Griffin, 690 A.2d 1192 (Pa.Super. 1997).

[3] Mother filed a brief in opposition.  Neither LCCYS nor the guardian ad litem filed a brief.

(Pa.Super. 2009).   Upon review of the certified record, we affirm the order denying the motion to intervene.

The Pennsylvania Rules of Juvenile Court Procedure govern motions to intervene in ongoing dependency proceedings.  Specifically, Pa.R.J.C.P. 1133 provides,

> Motion to Intervene
>
> A. Contents. The motion to intervene shall include:
>
> (1) the name and address of the person moving to intervene;
>
> (2) the relationship of the intervening person to the child;
>
> (3) the contact between the child and the intervening person;
>
> (4) the grounds on which intervention is sought;  and
>
> (5) the request sought.
>
> B. Action by court. Upon the filing of a motion to intervene and after a hearing, the court shall enter an order granting or denying the motion.

Pa.R.J.C.P. 1133.  As explained in the comments to the rule, the standard of proof required for intervention mirrors that of demonstrating standing in civil cases, i.e., "To move for intervention in a dependency case, a person is to show that the interest is substantial, direct, and immediate."   Rule 1133 cmt.  Thus, to the extent that standing and intervention are distinct concepts under the rules of civil procedure, the terms are used interchangeably in dependency jurisprudence.   More accurately stated, intervention is the means that a nonparty achieves standing in a dependency proceeding.  E.g.,

In re G.D., 61 A.3d 1031, 1042 ("Upon considering Aunt's [Rule 1133] motion and the evidence from both of the hearings, the trial court found insufficient grounds for granting Aunt's motion to intervene, i.e., Aunt failed to establish that she had either statutory standing or stood in loco parentis as to Child.").

Section 6336.1(a) and (b) of the Juvenile Act, relating to notice and hearing, provides foster parents and preadoptive parents notice of hearings and the right to be heard regarding the dependent child's "adjustment, progress and condition." 42 Pa.C.S. § 6336.1. Generally, foster parents do not have standing to participate in dependency proceedings. Id. ("nothing in this section shall give the foster parent, preadoptive parent or relative providing care for the child legal standing in the matter being heard by the court.").

Indeed, the statutory scheme outlining foster-parent rights in the context of dependency proceedings and the case law confronting this issue limit standing in dependency proceedings to a narrow class of participants. "Only a 'party' has the right to participate, to be heard on his or her own behalf, to introduce evidence, and/or to cross-examine witnesses." In re L.C., II, 900 A.2d 378, 380–81 (Pa.Super. 2006). We have defined party to include "(1) the parents of the juvenile whose dependency status is at issue; (2) the legal custodian of the juvenile whose dependency status is at issue,

or (3) the person whose care and control of the juvenile is in question." In re J.S., supra. We explained the underlying rationale as follows:

> These categories logically stem from the fact that upon an adjudication of dependency, the court has the authority to remove a child from the custody of his or her parents or legal custodian. Due process requires that the child's legal caregiver, be it a parent or other custodian, be granted party status in order to be able to participate and present argument in the dependency proceedings.

Id. (cleaned up).

Appellants are not a party to the dependency proceeding. They are neither the parents nor legal custodians of M.R.F, and they are not the people whose care and control is in question. Thus, they do not have standing to participate in the dependency proceedings as a party possessing the rights to counsel, to argue their own interests, to introduce evidence, and/or to cross-examine witnesses pursuant to 42 Pa.C.S. §§ 6336.1(a), 6337, and 6338. See In re J.F., 27 A.2d 1017 (Pa.Super. 2011) (since foster parent lacked standing, she did not have rights of a party, i.e., the right to counsel, call witnesses, and conduct cross-examination).

Nevertheless, our case law has carved a narrow exception to permit the limited participation of a foster resource who has attained prospective-adoptive status: prospective adoptive parents have standing to contest the child welfare agency's decision to remove a child it placed with them in anticipation for adoption. See In re Griffin, 690 A.2d 1192 (Pa.Super. 1997); Mitch v. Bucks County Children and Youth Social Service

Agency, 556 A.2d 419, 423 (Pa.Super. 1989) (prospective adoptive parents have standing in juvenile court to contest agency's decision to remove foster child from their physical custody).

In re Griffin addressed whether dissatisfied foster parents had standing to appeal a juvenile court's decision to remove a dependent child from their care. In upholding the foster parents' standing to appeal from the juvenile court order, this Court reasoned that, as the designated prospective adoptive parents, they had an expectation of permanent custody that grants them standing in dependency matters involving the foster child. We offered the following rationale:

> [P]rospective adoptive parents, unlike foster parents, have an expectation of permanent custody which, though it may be contingent upon the agency's ultimate approval, is nevertheless genuine and reasonable. Because of this expectation of permanency, prospective adoptive parents are encouraged to form emotional bonds with the child from the first day of the placement. By removing the child from the care of the prospective adoptive parents, the agency forecloses the possibility of adoption. In light of the expectation of permanent custody that attends an adoptive placement, an agency's decision to remove a child constitutes a direct and substantial injury to prospective adoptive parents. Because prospective adoptive parents, unlike foster parents, suffer a direct and substantial injury when an agency removes a child from them, we see no reason in law or policy why we should limit their standing to sue for custody.

In re Griffin, supra at 1201 (quoting Mitch, supra at 419) (emphases added). With these principles in mind, we address the merits of Appellants' complaints.

At the outset, we address the evidentiary claims that Appellants assert in Issue B and Issue C, and for the following reasons, we reject those claims of error. We review a trial court's evidentiary rulings for an abuse of discretion. Lykes v. Yates, 77 A.3d 27 (Pa.Super. 2013). Instantly, Appellant complains that the juvenile court erred in failing to admit evidence regarding M.R.F.'s interactions with the foster family and the bonds that he formed during the three years that he was in placement. In addition, Appellants argue that the juvenile court barred evidence of their subjective expectation of adopting M.R.F.

In rejecting these positions, the trial court concluded that the proposed testimony was irrelevant to the prevailing question concerning whether Appellants had standing to participate in the dependency proceedings pursuant to 42 Pa.C.S. § 6336.1 and the prevailing case law. We agree.

The dispositive questions in this case are whether Appellants fit into one of the three categories of a party, or fall within the designation of preadoptive/prospective adoptive parents who challenge an agency's decision to remove a preadoptive child from their home. Those are legal questions that are independent of best-interest considerations and the foster families' subjective beliefs. Hence, we agree that Appellants' proposed evidence regarding the bonds that M.R.F. formed with his foster family during his three-year placement and their subjective expectations of

adoption are irrelevant. Again, the only relevant evidence in this case related to Appellants' potential status as either a party or a prospective adoptive parent—two objective determinations. Therefore, no relief is due.

Next, we address whether the trial court erred in concluding that Appellants lacked standing to participate in the dependency proceedings. This subsumes the arguments Appellants raised in the statement of questions presented under Issues A and D.

In rejecting Appellants' petition to intervene, the juvenile court reasoned, in part, that Appellants did not establish that they had attained the status of prospective adoptive foster parents. Specifically, the trial court found that Appellants "failed to present any evidence which supported their claim that they were pre-adoptive/prospective adoptive parents." Trial Court Order and Opinion, 5/25/17, at 2. The juvenile court further explained,

> because the record is devoid of any official action altering [Appellants'] status from foster parents to pre-adoptive adoptive parents, the Court finds that [Appellants'] status has never changed from that of foster parents. [Appellants'] belief that they are pre-adoptive/prospective adoptive parents to M.R.F. . . . does not confer such a status upon them.

Id.

Appellants counter that they are, in fact, the prospective adoptive parents of four-year-old M.R.F., whom they have taken care of since he was three months old. They highlight that LCCYS not only specifically requested that they become an adoptive resource, but also paid for them to obtain adoption certification through SWAN.

While we agree with the trial court's determinations that it never formally recognized a change of status and that Appellants' subjective beliefs were immaterial, for the reasons discussed, infra, the certified record belies the juvenile court's conclusion that Appellants never attained preadoptive status. The record sustains an objective determination that Appellants have a legitimate expectation of adopting M.R.F., even though that outcome remains contingent upon the termination of Mother's parental rights and LCCYS's approval.

During the evidentiary hearing on Appellants' petition to intervene in the dependency proceedings, Ms. Gould, the LCCYS caseworker assigned to the family, testified that the agency considered Appellants to be a preadoptive resource, and she verified that the couple completed the adoption program administered by SWAN. N.T., 5/23/17, at 42, 43. She explained, "When we file for termination of parental rights, . . . we like to have a pre-adoptive home identified if we are deciding to move forward." Id. at 43. She continued, "if a child has been in a home for an extended length of time, we . . . ask that family whenever we decide to move towards termination of parental rights if they wish to be a pre-adoptive [resource]." Id. Most importantly, Ms. Gould verified that even though the current permanency goal is reunification with Mother, if the juvenile court sought to pursue the concurrent goal of adoption, the agency still would look to Appellants as the preadoptive resource. Id. at 47.

Likewise, the testimony of K.L.C. and J.M.C. confirmed that during April 2016, LCCYS directed them to obtain adoption certification in anticipation of terminating Mother's parental rights. Id. at 12, 34-35. By completing the required program, which the agency paid for, Appellants became eligible to perfect the adoption. Id. at 13, 15. The couple intended to adopt M.R.F. before the eligibility expired during April 2019. Id. at 15, 36-37. J.M.C. summarized LCCYS's positon on the previously anticipated adoption as follows: "They sent us for classes to become adoptive parents so when the [termination] hearing was [over] . . ., we were to be the adoptive parents. Id. at 39. K.L.C. testified that she believed that LCCYS still supported their intent to adopt M.R.F. Id. at 21, 28.

While the guardian ad litem did not present any evidence or witnesses during the hearing, it supported Appellants' petition to intervene and opined that the agency's regard of Appellants as a preadoptive resource never changed. Mindful of that position, and in light of the foregoing testimony demonstrating LCCYS's perspective of Appellants as a preadoptive resource upon the termination of Mother's parental rights, we conclude that the trial court erred in concluding that Appellants did not demonstrate that they were preadoptive foster parents as envisioned in In re Griffin.

Finally, to the extent that the juvenile court reasoned that Appellants were precluded from having any expectation of adoption because it denied LCCYS's petition to terminate Mother's parental rights and declared that the

child's permanency goal remained reunification, the court's reasoning is flawed. While M.R.F. is not eligible for immediate adoption, that option has not been foreclosed. Although the trial court denied the petition to terminate Mother's parental rights, and gave her an opportunity to prove her commitment to reunification, that does not negate Appellants' preadoptive status. Indeed, adoption remains the concurrent goal, and M.R.F. continues to be placed with Appellants while Mother attempts to demonstrate her resolve.[4] Although adoption is no longer imminent, it continues to be a plausible outcome of this case, particularly in light of the fact that M.R.F. has remained in dependency placement for three years—approximately one-year more than the eighteen to twenty-four months typically allotted to finding permanency closure for dependent children. Hence, notwithstanding the increase in Mother's visitation schedule, Appellants continue to have the expectation of adoption. Thus, the trial court's reliance on the current posture of the dependency proceedings to bolster its conclusion that Appellants are not a preadoptive resource is ineffectual.

Notwithstanding Appellants' designation as preadoptive foster parents, we affirm the juvenile court order denying intervention because the purpose

_____

[4] Mindful that M.R.F. has remained in foster care for what is approaching four years, we believe it imperative that the juvenile court develop some sense of urgency in finding permanency for the child, whether it is through reunification with Mother, adoption, or another alternative available to the juvenile court pursuant to § 6351(f.1) (3) and (4) of the Juvenile Act.

of Appellants' intervention, i.e., to protest Mother's increased visitation and to request the initiation of further proceedings under the adoption act, exceeds the limited scope of participation that In re Griffin permits. Phrased differently, as preadoptive foster parents, Appellants would have standing to pursue the narrow basis recognized in In re Griffin, supra, but for the reasons we discuss infra, standing is not found here and hence, intervention was properly denied.

Instantly, Appellants are not seeking to intervene in the dependency proceedings in order to protect their interest from LCCYS's decision to remove M.R.F., and they are not at risk of suffering a substantial injury due to the child's removal. Likewise, this is not a scenario where LCCYS decided to foreclose the possibility of Appellants' adoption of M.R.F. Indeed, Ms. Gould testified that the agency is pleased with Appellants' care of M.R.F., does not intend to move him to a different foster family, and still considers Appellants to be the primary adoptive resource if Mother's parental rights are eventually terminated. N.T., 5/23/17, at 46-47. Since Appellants' desire to intervene in the dependency proceedings relates to the substance of the juvenile court's decisions to provide Mother increased visitation, rather than the agency's decision to remove the child from their care, Appellants' entreaty does not implicate the significant interests that we have permitted the preadoptive foster parents to protect in In re Griffin, supra, and its progeny. Accordingly, it does not fit within the narrow exception to

the general rule that limits standing in dependency matters to the three classes of parties listed in In re L.C., II, supra. Hence, the juvenile court did not err in denying the petition for intervention.

As our holding in In re Griffin, supra, does not apply to Appellants' reasons for seeking to intercede in the instant dependency proceeding, we affirm the juvenile court order denying their petition to intervene.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/28/2018