J-A18014-23

2024 PA Super 45

| | | |
|---|---|---|
| IN THE INTEREST OF: S.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.E. AND A.E. | : | |
| | : | |
| Appellants | : | |
| | : | |
| | : | No. 22 WDA 2023 |

Appeal from the Order Entered November 8, 2022
In the Court of Common Pleas of Allegheny County Juvenile Division at
No(s):  CP-02-DP-0000729-2020

BEFORE:  BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

OPINION BY KUNSELMAN, J.:                    **FILED: March 13, 2024**

A.E. and A.E. (Appellants) are former foster parents who received physical custody of S.W. (the Child) one month after her birth.  They retained custody for nearly two years as the dependency case played out between W.W. (Mother) and the Allegheny County Office of Children, Youth and Families (CYF).[1]  Although the termination of Mother's rights was imminent, CYF had second thoughts about the suitability of the Child's placement with Appellants.  CYF petitioned for the removal of the Child from Appellants' care, and the juvenile court granted the request.  Appellants sought the Child's return, but because they were not parties to the dependency proceedings, they first had to motion to intervene.

Foster parents are generally prohibited from participating in dependency proceedings, but there exists a judicially created exception to this rule –

_____

[1] The Child's birth father was unknown.

namely, the "prospective adoptive parent exception." *See In the Interest of M.R.F., III,* 182 A.3d 1050, 1055-56 (Pa. Super. 2018). Under the exception, if pre-adoptive foster parents demonstrate that they have a legitimate expectation of adoption, then they may intervene in the dependency proceedings to challenge the child's removal. At the hearing to establish whether Appellants met the prospective adoptive parent exception, CYF argued to the juvenile court that the exception was abrogated by the current iteration of the Juvenile Act. *See* 42 Pa.C.S.A. § 6336.1(a). Persuaded by CYF's argument, the juvenile court subsequently denied Appellants' motion to intervene. After careful review, we conclude that *M.R.F., III* remains good law, that Appellants satisfied the prospective adoptive parent exception, and thus the juvenile court erred when it denied their motion to intervene. On remand, Appellants may intervene to seek the Child's return until such time that the proceedings culminate under Pennsylvania Rule of Juvenile Court Procedure 1631 ("Termination of Court Supervision").

The relevant factual and procedural history is as follows. The Child was born in September 2020. Mother and the Child came to the attention of CYF approximately a month a later. CYF had received a report about Mother's mental health, and upon its investigation, CYF believed Mother could not care for the infant Child. CYF obtained an emergency custody authorization to remove the Child from Mother's care. In October 2020, CYF (in conjunction with the service provider, Pressley Ridge) had the Child placed in Appellants'

care. The Child was adjudicated dependent under the Juvenile Act in November 2020.

Over the next two years, the juvenile court conducted regular permanency review hearings. On March 31, 2022, CYF petitioned to involuntarily terminate Mother's rights, pursuant to the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The termination hearing was scheduled for August 26, 2022. But two weeks prior to that hearing, on August 12, 2022, CYF filed a motion to remove the Child from the Appellants' home. According to the motion, CYF had concerns about the suitability of the Child's placement. Allegedly, Appellants used inappropriate language when talking about Mother; they demanded a reduction in visits between Mother and the Child; they changed the Child's doctor, although they were told not to; and they were combative and unwilling to cooperate with Pressley Ridge. The juvenile court entered an order directing CYF to notify Appellants, in accordance with 42 Pa.C.S.A. § 6336.1(a) (providing foster parents with notice of a juvenile court hearing and the right to be heard).

The juvenile court held a hearing on CYF's motion on August 26, 2022, the date originally set for the termination hearing, which had been continued. Present were the dependency litigants: Mother's counsel (Mother was not present); a representative from CYF along with an assistant county solicitor; and the Child's guardian *ad litem.* Appellants were also present with counsel. Prior to taking any testimony, the juvenile court addressed the issue of standing and clarified whether Appellants sought to intervene in the

dependency proceedings. Appellants explained they were not seeking to intervene as parties, but that they opposed CYF's motion and invoked their right to be heard under Section 6336.1(a). At the conclusion of the hearing, the juvenile court granted CYF's request and removed the Child from Appellants' care. The Child was then placed with another foster family. The change in placement occurred on September 6, 2022.

On September 13, 2022, Appellants filed a motion to intervene, seeking the return of the Child. The juvenile court denied the motion without prejudice for failure to conform with the Pennsylvania Rules of Juvenile Court Procedure – namely Pa.R.J.C.P. 1133 (requiring would-be intervenors to state the grounds on which intervention is sought). In October 2022, Appellants re-filed their motion, accompanied with a memorandum of law. Appellants alleged they were "prospective adoptive parents" and that they should be permitted to become parties to the underlying dependency proceedings. On October 26, 2022, the juvenile court held a hearing, and heard the legal arguments from Appellants' counsel, CYF, Mother's counsel, and the Child's guardian *ad litem*. The juvenile court denied Appellants' motion to intervene, on the merits, by order dated November 8, 2022.

On December 8, 2022, Appellants filed a petition for permission to appeal. On January 5, 2023, this Court directed that the petition for permission to appeal be treated as a notice of appeal and assigned it docket number. The next day, Appellants filed a concise statement of errors

complained of on appeal. *See* Pa.R.A.P. 1925(a)(2); 905(a)(2); 906(a)(2). The juvenile court issued a Rule 1925(a) opinion on February 17, 2023.

Meanwhile, the Child's dependency proceedings had pressed on. The Child never returned to Mother's care but remained with the new pre-adoptive foster parents. The court held a termination hearing in January 2023 and terminated Mother's rights by order entered on February 15, 2023. Mother appealed the termination. Both appeals were pending before this Court. This Court affirmed the termination of Mother's rights on November 8, 2023.

In the instant appeal, Appellants present the following four issues for our review, which we reorder for ease of disposition:

> 1. Whether the juvenile court erred or abused its discretion by not allowing Appellants to intervene in the dependency action?
>
> 2. Whether the juvenile court erred or abused its discretion by applying an orphans' court rule/ definition in a juvenile court action?
>
> 3. Whether the juvenile court erred or abused its discretion by suggesting that the right to intervene was waived by the proposed intervenors?
>
> 4. Whether the juvenile court erred or abused its discretion by scheduling the matter only for argument and not for a hearing?

Appellants' Brief at 9 (not paginated) (style adjusted).

In matters arising under the Adoption Act, "our plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact, and is compelled to perform

a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." ***Interest of K.N.L.***, 284 A.3d 121, 132-33 (Pa. 2022) (internal quotations and further citations omitted). Moreover, Appellants' four issues present legal questions, for which our review is *de novo*. ***M.R.F. III***, 182 A.3d at 1054.

Our discussion begins with Appellants' first and second issues, which we address contemporaneously. Appellants argue that the juvenile court erred when it denied their motion to intervene. Appellants wanted to intervene in the dependency proceedings so that they could petition for the return of the Child they had been fostering – a Child that Appellants had intended to adopt after Mother's rights were terminated.

Under Pennsylvania law, only parties can participate in dependency proceedings. The Juvenile Act does not define "party," but our courts have recognized parties as: (1) the parents of the child; (2) the legal custodian of the child; or (3) the person whose care and control of the child is in question. ***See, e.g., Interest of M.M.***, 302 A.3d 189, 199-200 (Pa. Super. 2023). Our courts further recognized one exception that permits foster parents to intervene in dependency proceedings in a very limited capacity.

Before addressing that exception, we discuss in detail the evolving role of foster parents in dependency cases. Traditionally, foster parents were forewarned that their place in the child's life was only ***temporary***, and that they should not form emotional bonds, or have any expectation of adoption:

Foster care has been defined as a "child welfare service which provides substitute family care for a planned period for a child when his own family cannot care for him for a temporary or extended period, and when adoption is neither desirable nor possible." *Smith v. Organization of Foster Families*, 431 U.S. 816, 824 (1977) (citing Child Welfare League of America, Standards for Foster Family Care Service 5 (1959)).

The distinctive features of foster care are first, "'that it is care in a *family*, it is noninstitutional substitute care,'" and second, "'that it is for a *planned* period – either temporary or extended. This is unlike adoptive placement which implies a *permanent* substitution of one home for another.'" [*Smith*,] 413 U.S. at 824, citing A. Kadushin, Child Welfare Services 355 (1967).

*Priester v. Fayette County Children and Youth Services*, 512 A.2d 683 (Pa. Super. 1986) (emphasis original).

In *Priester*, this Court concluded that, given the temporary nature of the foster care, the original foster parents lacked standing to challenge the agency's removal of the child and subsequent placement with new foster parents. *Priester*, 512 A.2d at 685.

A few years later, this Court recognized the expectation created when individuals care for a dependent child in anticipation of an adoption. In *Mitch v. Bucks County Children and Youth Social Service Agency*, 556 A.2d 419, 423 (Pa. Super. 1989), the child was placed with the appellants through a private organization that contracted with the local child protective services agency. The agency then removed the child and placed him with another family. The appellants sued for the child's return. After considering decisions from other states, we concluded that the appellants had standing to challenge

the removal, because they were "prospective adoptive parents." *Mitch*, 556 A.2d at 423.

Critically, we distinguished "prospective adoptive parents" from foster parents to explain why they warranted standing:

> [P]rospective adoptive parents, unlike foster parents, have an expectation of ***permanent*** custody which, though it may be contingent upon the agency's ultimate approval, is nevertheless genuine and reasonable. Because of this expectation of permanency, prospective adoptive parents are encouraged to form emotional bonds with the child from the first day of the placement. By removing the child from the care of the prospective adoptive parents, the agency forecloses the possibility of adoption. In light of the expectation of permanent custody that attends an adoptive placement, an agency's decision to remove a child constitutes a direct and substantial injury to prospective adoptive parents. Because prospective adoptive parents, unlike foster parents, suffer a direct and substantial injury when an agency removes a child from them, we see no reason in law or policy why we should limit their standing to sue for custody.

*Mitch*, 556 A.2d at 423 (emphasis added).

Under *Mitch*, prospective adoptive parents suffer a direct and substantial injury when the child is removed and placed with new caregivers, who are not the biological parents. They are "injured" because that removal forecloses the possibility of future adoption – an adoption they reasonably expected. This injury implicates traditional notions of standing, which enables them to challenge the child's removal. *Mitch* did not define when "prospective adoptive parent" status attaches – *i.e.*, before or after the termination of parental rights. But under its facts, we noted that the prospective adoptive

parents sought intervention after the rights of the biological parents were terminated.

*In re Griffin*, 690 A.2d 1192, 1201 (Pa. Super. 1997), this Court reiterated the difference between foster parents and "prospective adoptive parents." But we added that foster parents could become "prospective adoptive parents" during dependency proceedings. *See Griffin*, 690 A.2d at 1201 (citing *Mollander v. Chiodo*, 675 A.2d 753, 757 (Pa. Super. 1996) and *In re: Baby Boy S.*, 615 A.2d 1355, 1357-58 (Pa. Super. 1992) *aff'd per curiam*, 657 A.2d 484 (Pa. 1995)). In *Griffin*, the local protective services agency sought to remove the children from the appellants' care – again, after the biological parent's rights were terminated. We ruled that appellants had standing under the "prospective adoptive parent" exception to challenge the removal.

Significantly, in December 1998, after *Mitch* and *Griffin* were decided, the Legislature enacted 42 Pa.C.S.A. § 6336.1. That statute explicitly addressed foster parents' ability to be heard in a dependency proceeding. The statute has been amended several times, but Subsection (a) has largely remained the same. The current iteration of Section 6336.1(a) provides:

> **(a) General rule**.--The court shall direct the county agency or juvenile probation department to provide the child's foster parent, preadoptive parent or relative providing care for the child with timely notice of the hearing. The court shall provide the child's foster parent, preadoptive parent or relative providing care for the child the right to be heard at any hearing under this chapter. **Unless a foster parent, preadoptive parent** or relative providing care for a child **has been awarded legal custody** pursuant to section

> 6357 (relating to rights and duties of legal custodian), ***nothing in this section shall give the foster parent, preadoptive parent or relative providing care for the child legal standing in the matter being heard by the court.***

42 Pa.C.S.A. § 6336.1(a) (emphasis added).

To the extent that the terms "foster parent" and "pre-adoptive parent" represent totally separate classes of individuals, as ***Mitch*** and ***Griffin*** suggest, the plain language of the statute encapsulates both classes, and declares that neither shall have standing in a dependency proceeding unless they had first been awarded legal custody. (In dependency proceedings, the local child protective services agency typically retains legal custody).

As noted, however, both ***Mitch*** and ***Griffin*** are cases where the termination of parental rights had already occurred, and the dependency proceedings were over. Thus, ***Mitch*** and ***Griffin*** do not conflict with Section 6336.1(a), if they are read to mean that prospective adoptive parents only have standing to participate in the subsequent adoption proceedings.

Following ***Mitch***, ***Griffin***, and the enactment of Section 6336.1(a), our courts had to resolve one question: Could the "prospective adoptive parent" exception apply to foster parents in the midst of dependency proceedings, in light of the plain language of 42 Pa.C.S.A. § 6336.1(a)?

This Court has applied Section 6336.1(a) on several occasions to rule that foster parents lacked standing to intervene in dependency matters. Indeed, an initial line of cases suggested that the Legislature foreclosed the ability of any foster parents, in dependency proceedings, to challenge the

- 10 -

removal of the child from their care. *See, e.g., In re L.C., II*, 900 A.2d 378, 381-82 (Pa. Super. 2006); *see also In re J.S.*, 980 A.2d 117, 121 (Pa. Super. 2009).

Our decision in *In re N.S.*, 845 A.2d 884, 887 (Pa. Super. 2004) was the closest we came to holding that the prospective adoptive parent exception was abrogated by statute. In *N.S.*, the foster mother initially challenged the removal of the child from her care, but she withdrew her appeal. Instead, she sought visitation, relying on the "prospective adoptive parent" exception under *Mitch*. We held that the foster mother merited no relief, because *Mitch* was decided prior to the enactment of Section 6336.1 *and* because there was never a pre-adoptive placement agreement, as there was in *Mitch*. *See N.S.*, 845 A.2d at 887.

Later, a subsequent line of cases suggested that the "prospective adoptive parent" exception survived the statute's enactment. *See, e.g., In re Adoption of B.R.S.*, 11 A.3d 541, 546 (Pa. Super. 2011) (observing that the foster parents qualified as prospective adoptive parents, but this status did not enable them to file their own petition to terminate a parent's rights; this status only allowed them to challenge the removal of the child from their care); *see also In re S.H.J.*, 78 A.3d 1158, 1162-63 (Pa. Super. 2013) (opining that the appellant-aunt failed to preserve the issue of whether she was a prospective adoptive parent but noting that she did not meet this status in any event); *and see In Interest of J.P.*, 178 A.3d. 861, 866-867 (Pa.

Super. 2018) (noting that appellant did not preserve the question of whether Section 6336.1(a) abrogated the prospective adoptive parent exception).

Ultimately, the most authoritative precedent we have on this issue is *In the Interest of M.R.F., III*, 182 A.3d 1050 (Pa. Super. 2018). There, the juvenile court denied the foster parents' petition to intervene in the dependency proceedings. We first explained that the foster parents were not parties to the dependency proceedings, as contemplated by Section 6336.1(a) or any other section of the Juvenile Act. *M.R.F., III*, 182 A.3d at 1055. However, we then extended the "prospective adoptive parent" exception to those proceedings.

"[O]ur case law has carved a narrow exception to permit the limited participation of a foster resource who has attained the prospective-adoptive status: prospective adoptive parents have standing to contest the child welfare agency's decision to remove a child it placed with them in anticipation for adoption." *Id.* at 1056 (citing *Mitch*, 556 A.2d at 423; *Griffin*, 690 A.2d at 1201). We defined "prospective adoptive parents" as "a would-be parent [who] has a legitimate, genuine, and reasonable expectation of adoption, even though the authority to finalize the adoption is contingent upon the [] agency's ultimate approval." *Id.* at 1054, n.2 (citing *Griffin*, *supra*). We concluded that the child's foster parents were prospective adoptive parents, thereby entitling them to standing in the dependency action.

In *M.R.F., III*, the lower court initially followed *Mitch* and *Griffin*, and ruled that the foster parents did not obtain prospective adoptive status,

because the record was devoid of "any official action altering [their] status from foster parents to pre-adoptive parents." ***M.R.F., III***, 182 A.3d at 1057 (quoting the trial court opinion).

On appeal, however, the ***M.R.F., III*** Court determined the certified record belied the lower court's conclusion that foster parents were not "prospective adoptive parents." ***Id.*** The facts showed, the foster parents cared for the child practically since birth; the agency considered the foster parents to be a pre-adoptive resource; the foster parents completed an adoption program; although the permanency goal was still reunification, the juvenile court pursued the concurrent goal of adoption; and the local protective services agency supported the potential adoption. ***See id.*** We discounted that the child was not immediately eligible for adoption (because the parental rights remained intact) and that the juvenile court never formally recognized the foster parents' change in status. ***See id.***

Notwithstanding the foster parents' "prospective adoptive" status, we held that the juvenile court was right to deny their petition to intervene because of the relief they were seeking. The foster parents sought to intervene only to challenge the court's decision to increase the number of visits between the mother and the child. We held that such a request was beyond the scope of the prospective adoptive parent exception, which grants foster parents standing to challenge only the removal of the child from their home. ***Id.*** at 1059. In other words, prospective adoptive parents can challenge the court's decision only as it affects their interest in adoption vis-

- 13 -

à-vis other foster placements, and not as it affects the rights of the biological parents. ***Id.***

In essence, our decision in ***M.R.F., III*** affirmed what our decisions in ***B.R.S***. and ***S.H.J., supra*** suggested – namely: the "prospective adoptive parent" exception survived the enactment of Section 6336.1(a); that the exception is available to foster parents involved in dependency proceedings, who have prospective adoptive status; but that this standing is only for a limited purpose.  Because prospective adoptive parent standing does not permit intervention in the dependency proceedings across the board, ***M.R.F., III*** tried to reconcile the judicially created standing exception with the plain language of Section 6336.1(a).

Two years later, another panel of this Court held, in a non-precedential decision, that the Juvenile Act abrogated the "prospective adoptive parent" exception.  ***Interest of K.R.***, 239 A.3d 70 (Table), 2020 WL 3989162 (Pa. Super. 2020).  There, the local child protective services agency removed the child from the foster parent's care after receiving reports that other children in the home were abused.  The foster parent, who had been a pre-adoptive resource for two years, sought to challenge the removal, but the juvenile court ruled that she lacked standing.  The foster parent appealed.  We first observed, as we did in ***M.R.F., III***, that foster parents generally do not qualify as parties. ***See K.R.*** at *4.

But the Court in **K.R.** went a step further, and ruled that Section 6336.1(a) has abrogated the "prospective adoptive parent" exception altogether:

> Prior to the enactment of Section 6336.1(a), our case law provided that a "prospective adoptive parent" possessed standing for the limited purpose of challenging the removal of a child from his or her care. **See Mitch v. Bucks County Children and Youth Social Service Agency**, 556 A.2d 419 (Pa. Super. 1989), *appeal denied*, 571 A.2d 383 (Pa. 1989); **In re Griffin**, 690 A.2d 1192 (Pa. Super. 1997), *appeal denied*, 700 A.2d 441 (Pa. 1997), *certiorari denied*, 523 U.S. 1004 (1998). Because Section 6336.1(a) plainly changes this prior case law, we conclude that a foster parent is not entitled to any form of standing in a dependency proceeding absent an award of legal custody, regardless of his or her "prospective adoptive" status.

**K.R.**, at *5, n.7.

For the Court in **K.R.** to reach this holding, however, it had to account for our opinion in **M.R.F., III**, which was decided after Section 6336.1(a) was enacted. To do so, the **K.R.** Court concluded that the language concerning the "prospective adoptive parent" exception was mere *dicta* and not a barrier to its holding. **See K.R.**, at *5, n.7. Ultimately, the Court ruled that the foster parent lacked standing to contest the removal of the Child.

Returning to the instant matter, the litigants and juvenile court struggled with what to make of our fractured jurisprudence. When CYF informed the juvenile court that it wanted to end the Child's placement with Appellants, Appellants did not officially seek to intervene. Instead, Appellants challenged the removal only insofar as Section 6336.1(a) would permit –

which was to attend the hearing and be heard. Only after the removal did the Appellants seek to formally intervene. During the ensuing argument hearing on intervention, the juvenile court repeatedly pressed the litigants for their understanding of the prospective adoptive parent exception, but none could offer much clarity. Ultimately, the juvenile court was persuaded by CYF's position that the prospective adoptive parent exception was abrogated by Section 6336.1(a), and that **M.R.F. III** was inapposite in light of **K.R**.

Thus, the first question – indeed, the essential question – we must decide is whether **M.R.F. III** is binding on this Court. The answer to that question rests on two axioms. First, a panel of the Superior Court cannot overrule another panel of the Superior Court. **See, e.g., Commonwealth v. Beck**, 78 A.3d 656, 659 (Pa. Super. 2013). Second, a non-precedential decision (formerly titled unpublished memoranda decisions) holds persuasive, but non-binding, authority. **See, e.g., E.C.S. v. M.C.S.**, 256 A.3d 449, 456 (Pa. Super. 2021); **see also** 210 Pa. Code. § 65.37; **and see** Pa.R.A.P. 126(b).

Put plainly, **K.R.** was bound by **M.R.F., III** and could not overrule it. However, **K.R.** could distinguish **M.R.F., III**, and in its view, the **K.R.** Court did so by holding that the prospective adoptive parent exception analysis in **M.R.F., III** was *dicta.* Because **K.R.** is non-precedential, this Panel is not bound by **K.R.**'s interpretation of **M.R.F., III**. We may decide the *dicta* question for ourselves.

Our Supreme Court has defined *obiter dictum* (*dicta* being the plural) as: "A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." **Commonwealth v. Romero**, 183 A.3d 364, 400 n.18 (Pa. 2018) (Opinion Announcing Judgment of the Court) (quoting BLACK'S LAW DICTIONARY 1240 (10th ed. 2014); **id. cf**. "*holding.*" BLACK'S LAW DICTIONARY 849 (10th ed. 2014) ("A court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision.").

Although we have significant misgivings about the prospective adoptive parent exception in dependency proceedings (discussed **infra**), the conclusions in **M.R.F., III**, regarding the exception were not mere *dicta*, but central to its holding. **M.R.F., III** held that the foster parents in that case met the prospective adoptive parent exception, full stop. That determination meant the exception survived the enactment of Section 6336.1(a) and that foster parents have standing in dependency proceedings for a limited purpose. This was the first part of the Court's holding.

The Court only denied the foster parents' intervention, because of the type of relief they requested. The foster parents sought to employ the exception only to limit visitation between the mother and the dependent child. This additional aspect of the holding did not render the initial standing determination "a passing comment" which was "unnecessary to the decision."

Rather, the Court concluded that the foster parents had standing to intervene but could not seek the relief they requested.

The determination that the foster parents met the prospective adoptive parent exception was a "determination of a matter of law pivotal to its decision;" it was "a holding," which binds other three-judge panels of this Court. **Beck, supra.** Put plainly, **M.R.F., III** remains good law, and we are bound by its determination. Because **K.R.** was a non-precedential decision, we are not confronted with a split of authority within our Court.

Nonetheless, we doubt the holding in **M.R.F., III** could withstand a closer examination by higher authorities, and we feel compelled to address these concerns. There are two reasons for our doubt.

First, we question whether the plain language of Section 6336.1(a) could permit the exception. The panel in **M.R.F., III** was not directly confronted with the question of whether the exception was abrogated by statute. When faced with that question squarely, it would seem that Section 6336.1(a) plainly disallows standing to any foster parent, pre-adoptive parent, or relative providing care to the child, at least when it comes to the dependency proceedings – that is, there should be no exception to non-party standing while a parent's rights remain intact. As a matter of statutory construction, Section 6336.1(a) appears fairly unambiguous insofar as it simply does not grant foster parents – or pre-adoptive parents – any standing in any juvenile matter unless they have been awarded legal custody. Under this provision, foster parents in dependency proceedings are entitled to notice of the hearing,

and they are entitled to be heard, but that would appear to be the extent of their rights.[2]

Second, we doubt that a foster parent's interest in a potential adoption could be superlative to the rights of parents or to the duty of local child protective services agencies to reunify families. As the law stands today, foster parents who achieve prospective adoptive status are entitled to intervene only to protect their interest in a potential adoption. We noted *supra* that their "standing" comes from the injury they would sustain if their bond with the foster child were severed.

By extending the holdings of **Mitch** and **Griffin** to foster parents involved in dependency proceedings, **M.R.F., III** implicitly[3] recognized the shift in how our society has come to understand the role of foster parents. The notion that foster parents do not – or should not – return the emotional bonds with the foster children is archaic and incompatible with our juvenile law's modern approach of concurrent permanency-goal planning (e.g., parental reunification **and** foster parent adoption). **See Priester**, 512 A.2d

---

[2] These rights should not be understated. The foster parents' views during the dependency proceedings are integral to the juvenile court's understanding of the child's best interests. The foster parents' involvement in these hearings also helps the court understand whether the foster parents could be a viable pre-adoption resource. However, these rights are limited to notice and participation as a fact-witness, not as a party to the dependency proceedings (discussed **infra**).

[3] Here, too, we note that the panel in **M.R.F., III** was not directly confronted with the question of whether the prospective adoptive parent exception should be extended to dependency proceedings, but that was certainly the effect of its decision.

683 (citing Child Welfare League of America, Standards for Foster Family Care Service 5 (1959)); *cf. In re R.J.T.*, 9 A.3d 1179, 1191 n.14 (Pa. 2010) (observing that the *Pennsylvania Dependency Benchbook* recommends concurrent planning as a "best practice."); *see also In the Interest of K.T.*, 296 A.3d 1085, 1105-1106 (Pa. 2023) (requiring courts to consider whether the child is in a pre-adoptive foster home and has a bond with the foster parents when deciding whether to involuntarily terminate a parents rights under 23 Pa.C.S.A. § 2511(b)).

Additionally, the outdated expectation that foster parents should not become attached to foster children conflicts with the current government policy encouraging bonding between foster parents and the children. *See Pennsylvania Needs Foster Families,* Pa. Dep't. Human Servs. (last visited Feb. 21, 2024) https://www.dhs.pa.gov/AdoptPAkids/Pages/Foster-Parent.aspx (stating "By bonding with their foster families, the child will be better prepared for life's ups and downs because they were loved and cared for by everyone involved in their care.").

To be sure, we are profoundly sympathetic to the emotional bonds that develop between foster parents and the children in their care. The children often refer to their foster parents as "mom and dad," and they consider the other children in the home to be their siblings. To that end, our laws have repeatedly and thoroughly stressed how stability is vital to the healthy development of a child. *See In re D.C.D.*, 105 A.3d 662, 676 (Pa. 2014) ("[I]t is beyond cavil that the protection of children, and in particular the need

to provide permanency for dependent children, is a compelling state interest."); *see also In re T.S.M.*, 71 A.3d 251, 257, n.14 (Pa. 2013) (discussing the dangers of "foster care drift"); *and see* 23 Pa.C.S.A. § 5328(a)(4), (9) (identifying stability factors to consider when awarding custody under the Child Custody Act).

Ironically, foster parents sacrifice their own sense of stability so that the children might have the same. They must love the children as any parent would love their child, without reservation, while knowing full well that the court may order reunification with the biological parent at any point. Foster parents may exist in this limbo for years. Given the shortage of foster parents, providing these individuals a modicum of assurance might be for the betterment of all.

However, public policy questions must be left to our Legislature and our Supreme Court. *See, e.g., Z.F.1 by & through Parent v. Bethanna*, 244 A.3d 482, 494 (Pa. Super. 2020). And notwithstanding the emotional bond between pre-adoptive foster parents and the child in their care, we question whether the prospective adoptive parent's "legitimate expectation" interest could survive constitutional scrutiny.[4] We also question whether the

_____

[4] The government – by way of the local child protective services agency – may narrowly infringe upon the parent's constitutional right to the care, custody, and control of the child, because it has a compelling state interest – namely, the protection and stability of the child. *See, e.g., In re D.C.D.*, 105 A.3d 662, 676-77 (Pa. 2014).

*(Footnote Continued Next Page)*

prospective adoptive parent's interest in adoption could be superlative to the local child protective agency's duty to exercise reasonable efforts to achieve parental reunification. "[T]he Legislature has provided that the relationship between the foster parents and the child is by its very nature **subordinate** both to the relationship between the agency and the child and to the relationship between the child and the child's parents." **In re Adoption of Crystal D.R.**, 480 A.2d 1146, 1150 (Pa. Super. 1984) (emphasis added); **see also In re G.C.**, 735 A.2d 1226, 1228 (Pa. 1999) (Opinion in Support of Affirmance). Juvenile courts and local protective services agencies must be free to navigate parental reunification without interference from non-parties, even as they identify and implement a concurrent adoption goal. This has always been the intention of the Legislature, which is why, one could assume, it enacted Section 6336.1(a).

_____

The prospective adoptive parent exception might also infringe upon a parent's rights – assuming that the parent's rights are still intact. **See, e.g., D.P. v. G.J.P.**, 146 A.3d 204 (Pa. 2016); **see also** U.S. CONST. amend. XIV, § 1 (forbidding states from depriving "any person of life, liberty, or property, without due process of law," or from denying to any person within their jurisdiction "the equal protection of the law").

Some might question the constitutionality of the prospective adoptive parent exception as applied to foster parents involved in dependency proceedings; for how can foster parents assert a "pre-adoptive" interest to a child, when parental reunification is a permanency goal. And although the need to provide the child stability is a compelling state interest, ultimately the courts might have to decide whether the preservation of foster parents' legitimate expectation of adoption is narrowly tailored to advance that interest.

Ultimately, these concerns are not presently before us. Whether there is a conflict between **M.R.F., III** and Section 6336.1(a), or whether **M.R.F., III** was wrongly decided are questions that can only be answered by an *en banc* panel of this Court or our Supreme Court. At this point, we are bound by **M.R.F., III**.

Constrained to apply **M.R.F., III**, it is obvious that Appellants met the prospective adoptive parent exception. A proper inquiry requires courts to take an objective view of the full record and determine whether the foster parents had a legitimate expectation of adopting the Child. **M.R.F., III**, 182 A.3d at 1057. The "legitimate, genuine, reasonable **expectation of adoption**" is the polestar, not whether the foster parents were formally recognized as "prospective adoptive" foster parents, either by the court or by the agency. **See id.** at 1054, n.2. The foster parents' "legitimate expectation" is what encourages foster parents to "form emotional bonds with the child." **Id.** at 1056 (citing **Mitch**, **supra** at 419; **Griffin, supra** at 1201). When an agency removes the child, the possibility of the adoption is foreclosed, and those bonds are severed. **Id.** This is a "direct and substantial injury" that warrants standing. It starts with the "legitimate expectation" of adoption. The inquiry is an objective one; we clarified the foster parents' subjective beliefs are immaterial, but, so too, is the lack of any formal designation. **Id.** at 1057.

When considering the full record here, it is evident Appellants had a legitimate expectation of adoption, contingent upon the termination of

Mother's rights; thus, Appellants were "prospective adoptive parents." Like ***M.R.F.***, ***III***, Appellants had fostered the Child practically since birth.[5] Also like ***M.R.F., III***, CYF started taking action to facilitate the post-termination adoption. The caseworker advised Appellants they were the only prospective adoptive resource. Appellants were assigned a separate "adoption caseworker," evincing CYF's belief that Appellants would adopt. Appellants began filling out the necessary paperwork. Pressley Ridge, the service provider, was also in favor of the Appellants' potential adoption. Appellants began discussing with the caseworkers whether they would enter into a voluntary post-adoption contact agreement with the Child's biological family. Whether there was a formal recognition of pre-adoptive status (like in ***Griffin***) or an adoption agreement (like in ***Mitch***) are perhaps sufficient facts, in an objective inquiry, to demonstrate a legitimate expectation of adoption. But the absence of those facts is not dispositive. ***See id.***

CYF counters that Appellants could not have an expectation of adoption, because reunification remained the permanency goal of the dependency proceedings. We are not persuaded by this argument for several reasons. For one, ***M.R.F., III*** held that foster parents could still have a legitimate expectation of adoption, even when the parental rights remain intact – indeed,

---

[5] In ***M.R.F., III***, the child entered the home of his foster parents when he was four months old and had been nearly four years old at the time of our decision. Here, the subject Child entered Appellants' care in October 2020 when she was one month old and resided with Appellants until September 2022.

even when the visits between the parent and the child **_increase_**. **_See M.R.F., III_**, 182 A.3d at 1058. Moreover, even though the permanency goal was still reunification, CYF and the juvenile court anticipated that Mother's rights would eventually be terminated. CYF filed its petition to terminate Mother's rights in March 2022, and the juvenile court had scheduled a goal change hearing for May 2022, both of which were months before CYF decided to remove the Child from Appellants' care. Indeed, the August 2022 removal hearing was held on the date that initially had been reserved for the termination hearing.

Two years into the Child's dependency case, where Appellants had been the caregivers since the Child was a newborn, it strains credulity to believe that CYF did not consider Appellants to be **_the_** pre-adoptive resource (let alone **_a_** pre-adoptive resource). Under these facts, Appellants had a legitimate, genuine, and reasonable expectation that they would eventually adopt the Child, if and when Mother's rights were terminated. Therefore, they established that they met the prospective adoptive parent exception, as set forth in **_M.R.F., III_**, and we must conclude the juvenile court erred when it denied their motion to intervene.[6]

_____

[6] Significantly, the issue of intervention is wholly different than the substantive question about whether the Child should have been removed from – or returned to – Appellants' care. The only question at that juncture was whether Appellants had a legitimate, genuine, and reasonable expectation that they would eventually adopt the Child. If so, then they had standing to pass through the courthouse doors and challenge the removal.

_(Footnote Continued Next Page)_

Having addressed Appellants' first two issues on appeal, and we proceed to the third issue: whether the juvenile court erred or abused its discretion by suggesting that Appellants waived their right to intervene. Preliminarily, we note that although the juvenile court suggested waiver, it did not deny intervention on this basis.[7]

We recognize that the juvenile court held an evidentiary hearing on August 26, 2022 to determine whether the Child should be removed from Appellants' care. Appellants were present with counsel, but they conceded they were not parties and they explicitly said they were not presently seeking to intervene. *See generally* N.T., 8/26/22, at 8-12. Because Appellants were not parties to the dependency proceeding, their rights were limited to notice and to being heard, pursuant to Section 6336.1(a). Appellants could not make objections, they could not introduce evidence, nor could they cross-examine witnesses. *See M.R.F.*, 182 A.3d at 1055. Indeed, the juvenile

_____

However, we emphasize that the standing inquiry is a legal question that is "independent of the best-interests considerations." *M.R.F., III*, 182 A.3d at 1057. Appellants met the standing threshold, but regarding the relief sought, deference is given to the lower court's "longitudinal understanding" of its dependency case and the best interests of the Child involved. *See R.J.T.*, 9 A.3d at 1190.

[7] Our learned colleague in Dissent, who has joined our analysis thus far, would conclude that Appellants waived their right to intervene. *See generally* Dissenting Opinion at 1-8. The Dissent believes that Appellants slept on their rights when they explicitly told the juvenile court, at the removal hearing, that they did not seek to intervene in the dependency proceedings as parties. *Id.* at 3-4 (citing N.T., 8/26/22, at 6-12).

court directed Appellants' counsel to keep Appellants' testimony brief.[8]  Only later, after the removal, did Appellants seek to intervene to have the Child returned.

Critically, the Rules of Juvenile Court Procedure do not require intervention at the earliest opportunity.  The Juvenile Rules only dictate the contents of a motion to intervene and require the court to hold a hearing on the motion.  *See* Pa.R.J.C.P. 1133.  The Rules of Civil Procedure provide for intervention at *any time* during the pendency of an action.  *See* P.R.C.P. 2327 ("Who May Intervene").  "At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if… (4) the determination of such action may affect any legally enforceable interest of such person whether or not such person may be bound by bound by judgment in the action."  Pa.R.C.P. 2327(4).

Perhaps it would have been prudent for Appellants to seek intervention immediately in August 2022.  Hindsight is 20/20, of course.  Appellants opted instead to rely on their right to be heard, per Section 6336.1(a).  The path they chose was initially more conservative, more efficient, and almost certainly less expensive.  Had they successfully persuaded the juvenile court to deny CYF's request to remove the Child, then intervention would have been

_____

[8] We cannot say that the juvenile court's curtailment of the Appellants' testimony was a violation of their right – as foster parents – to be heard under Section 6336.1(a).  We mention the curtailment, however, to emphasize that Appellants were mere-fact witnesses.  They could not present a full case-in-chief as to why the Child should remain in their care.

unnecessary. But even though Appellants could have intervened sooner to prevent the Child's removal, it does not follow that they slept on their right to intervene later to seek the Child's return.

Appellants' final issue is whether the juvenile court erred when it failed to hold an evidentiary hearing on the motion to intervene. The Rules of Juvenile Court Procedure require courts to hold a hearing on a motion to intervene. *See* Pa.R.J.C.P. 1133(b). Moreover, we have held that "intervention" and "standing" are used interchangeably in the context of dependency proceedings. *M.R.F., III*, 182 A.3d at 1055. Although an evidentiary hearing is typically required to establish standing, the necessity of such a hearing depends on whether the facts are actually in dispute. *See, e.g., Raymond v. Raymond*, 279 A.3d 620, 626-67 (Pa. Super. 2022) (holding that the trial court was not required to conduct an evidentiary hearing on standing, where the essential facts were not in dispute).

Appellants' factual averments were largely uncontested by CYF. To be sure, CYF and Appellants certainly disagreed as to whether the Child's removal was justified, but there appeared to be no genuine dispute of material fact regarding their "pre-adoptive" status. CYF simply relied on *K.R.* and took the position that the legal definition of "prospective adoptive parent" was irrelevant because Section 6336.1(a) of the Juvenile Act abrogated the "prospective adoptive parent" exception. Thus, the question before the juvenile court was a legal one. Given the context of this case, the court did

- 28 -

not err when it failed to hold an evidentiary hearing, but instead proceeded by way of legal argument.

As a final note, we clarify the effect of our decision. Although Appellants demonstrated under **M.R.F., III** that could intervene in the proceedings, we must recognize the realty that those proceedings are concluding, and that intervention is nearly moot.[9] Appellants sought to intervene in the dependency proceedings shortly after the Child's removal. While the appeal on their intervention was pending, the orphans' court terminated Mother's rights, as well as the rights of the "Unknown Father." Mother appealed the termination, and this Court recently affirmed the orphans' court's decision. **See Interest of S.W.**, 2023 WL 7409888 (Pa. Super. November 8, 2023). We assume adoption proceedings between CYF, the Child, and her new prospective adoptive foster parents will transpire imminently. But until court supervision has been terminated, per Pennsylvania Rule of Juvenile Court Procedure 1631(a), the effect of our decision means that Appellants can technically still seek the return of the Child.[10]

_____

[9] "An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect." **Interest of D.R.-W.**, 227 A.3d 905, 917 (Pa. Super. 2020) (quoting **In re D.A.**, 801 A.2d 614, 616 (Pa. Super. 2002)); **see also E.B. v. D.B.**, 209 A.3d 451, 466 (Pa. Super. 2019) (holding we cannot vacate an erroneous interim custody order; "This is tantamount to 'unringing the bell' and rewinding the past two years of [the child's] life as if they never happened.").

[10] **See, e.g.,** Pa.R.J.C.P. 1631(a)(4) (providing that court supervision terminates "when court-ordered services from the county agency are no
*(Footnote Continued Next Page)*

We reiterate that our decision concerns the Appellants' ability to intervene in the dependency proceedings; it does not concern whether it is in the best interests of the Child to return to Appellants' care. Appellants must also understand that it is beyond the power of the appellate courts to "unring the bell" or rewind the Child's life. ***See E.B., supra.*** Lastly, we acknowledge Appellants only wanted to intervene in the dependency proceedings so they could adopt the Child after Mother's rights were terminated. Whether Appellants can rely on their "prospective adoptive parent" status to file a competing adoption petition is a separate question. ***See Griffin,***, 690 A.2d at 1197, 1199 (appellants' "prospective adoptive parent" status, obtained during the dependency stage, was asserted post-termination to challenge the child's removal); ***but see Interest of K.N.L.***, 284 A.3d 121, 147 (Pa. 2022) (distinguishing foster parents from "prospective adoptive parents," who have standing to seek adoption, because "prospective adoptive parents" have *in loco parentis* standing whereas foster parents typically do not) (citing ***Mitch***, 556 A.2d at 422-23); ***and see N.S.***, 845 A.2d at 886-87 (holding that former foster mother lacked *in loco parentis* standing to petition for adoption). As this question is not before us, we make no comment on whether Appellants can rely on their status as "prospective adoptive parents" to seek the adoption of the Child. ***See Sichelstiel v. Sichelstiel***, 272 A.3d 530, 539 (Pa. Super.

---

longer needed" and, ***inter alia***, "the child has been adopted and services are no longer needed"); ***but see generally*** Pa.R.J.C.P. 1631(a)(1)-(13); Comment.

2022) (holding that courts may not render decisions in the abstract or offer purely advisory opinions).

To conclude: we are constrained to apply **M.R.F., III**, and under that precedent, Appellants met the prospective adoptive parent exception. Thus, the juvenile court erred when it denied Appellant's petition to intervene. We conclude further that Appellants did not waive their ability to seek intervention by waiting until after the Child was removed from their care. Upon remand, Appellants may intervene in the dependency proceedings to seek the Child's return, until such time as those proceedings culminate under Pa.R.J.C.P. 1631. Under the facts of this case, the juvenile court did not err when it held an oral argument on Appellants' motion to intervene, without conducting an evidentiary hearing. Finally, we make no comment as to whether it would be in the Child's best interests to return to Appellants' care, nor do we comment as to whether Appellants could file a competing adoption petition.

Order vacated. Case remanded for further proceedings consistent with this decision. Jurisdiction relinquished.

Judge Lazarus files a Concurring Opinion.

P.J.E. Bender files a Dissenting Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

3/13/2024